1                    IN THE UNITED STATES DISTRICT COURT

2                      FOR THE DISTRICT OF NEW MEXICO

3

4    UNITED STATES OF AMERICA,

5          Plaintiff,

6      vs.                        1:13-cr-00064-MCA

7    THOMAS JONES and TERRENCE CONNORS,

8          Defendants.

9

10          Transcript of Evidentiary Hearing before The Honorable
     Carmen E. Garza, United States Magistrate Judge, held in
11   Albuquerque, Bernalillo County, New Mexico, commencing on
     Friday, August 30, 2013, at 9:30 a.m., and concluding at 1:20
12   p.m.

13

14   For the Plaintiff:  Norman Cairns, Esq.

15

16   For the Defendant
     Thomas Jones:       John F. Samore, Esq.
17

18
     For the Defendant
19   Terrence Connors:   Marc H. Robert, Esq.

20

21

22                     John De La Rosa, CCR
                 United States Official Court Reporter
23                  421 Gold Avenue, Southwest
                   Albuquerque, New Mexico  87102
24                   Phone:  505.348.2249

25

1          (In open court.)

2                THE COURT:  Good morning.  Please be seated.

3                All right.  Let me call the case of United States of

4    America versus Thomas Jones and Terrence Connors.

5                Counsel, please state your appearances for the record.

6                MR. CAIRNS:  Norman Cairns on behalf of the United

7    States, good morning, Your Honor.

8                MR. ROBERT:  Marc Robert on behalf of Mr. Jones who is

9    present.

10               MR. SAMORE:  John Samore on behalf of Terrence Connors,

11   Judge.  He appears to the court's left of counsel and he is in

12   custody.

13               THE COURT:  Thank you.  Good morning.  Counsel, thank

14   you for your ability to schedule this so quickly.  We

15   appreciate it.

16               All right.  Now, is the government wanting to make an

17   opening statement, opening remarks?

18               MR. CAIRNS:  I don't think given the briefing in the

19   case at this time that's necessary, Your Honor.

20               THE COURT:  All right.  And let me just ask the defense

21   counsel, do you want to make any opening remarks?

22               MR. ROBERT:  Not for Mr. Jones, Your Honor.

23               MR. SAMORE:  Judge, I feel the motions and responses

24   have adequately covered the issues.  We would also waive.

25               THE COURT:  All right.  I have read them carefully.

1           Let's see.  Mr. Robert, you didn't withdraw your

2     motion.  Are we going to address that at the end of this, your

3     motion to dispose --

4           MR. ROBERT:  Your Honor, as the week developed, the

5     request for information was for the identity of the

6     confidential informant as well as a variety of information

7     about him.  Because we felt that some of that information might

8     be relevant to things that may arise in today's hearing, as I

9     communicated to the court through your clerk, I believe, we

10    thought that that was still something that we needed to talk

11    about.  So I think the subject is going to come up in the

12    examination, and to the extent that -- well, we'll have to wait

13    and see what develops through testimony as to whether or not we

14    need to address it with the court.

15          THE COURT:  Thank you.  All right.  Is the government

16    prepared to call their first witness?

17          MR. CAIRNS:  Yes, Your Honor, the government calls Task

18    Force Officer Devin Verhulst.

19          MR. CAIRNS:  Your Honor, I don't have any witnesses in

20    the courtroom except for the case agent.

21          THE COURT:  Sitting at your table.

22          Counsel, are you invoking the rule?

23          MR. ROBERT:  Yes, Your Honor, thank you.

24          THE COURT:  Thank you, Mr. Robert.

25          Please come forward.  Please raise your right hand.

1                          **DEVIN VERHULST,**

2    after having been duly sworn, testified as follows:

3                        **DIRECT EXAMINATION**

4    **BY MR. CAIRNS:**

5    Q.  After you get seated there, please state your name for the

6    record.

7    A.  Devin Verhulst.

8    Q.  Where do you work, sir?

9    A.  I'm currently working with the San Juan County Sheriff's

10   Department.

11   Q.  Do you also have duties, do you function also as a task

12   force officer?

13   A.  Yes, I'm currently assigned to the Region II Task Force.

14           THE COURT:  Can you please just spell your name for the

15   record?

16           THE WITNESS:  D-E-V-I-N, V-E-R-H-U-L-S-T.

17           THE COURT:  Thank you.

18           MR. CAIRNS:  Your Honor, I submitted electronically a

19   witness list and exhibit list.  I have a copy if you would like

20   that.

21           THE COURT:  Okay.

22   Q.  (By Mr. Cairns)  All right.  Can you tell me a little bit

23   about what that task force does, what Region II Task Force

24   does?

25   A.  Basically, within San Juan County, we're tasked with trying

1    to identify, disrupt or dismantle drug trafficking

2    organizations that are operating within San Juan County.

3    Q.   How long have you worked with that task force?

4    A.   Currently been over there about three to four years.

5    Q.   Before that, how long have you been in law enforcement?

6    A.   Approximately 11 to 12 years.

7    Q.   I'm sorry, of that time, how long have you done narcotics

8    work?

9    A.   I've been out at Region II Narcotics Task Force for

10   approximately three or four years.

11   Q.   Now, can you tell me a little bit about how this

12   investigation, the investigation into Mr. Connors, began?

13   A.   It originally began with talking with a confidential

14   informant.

15   Q.   Just for the record, do you see Mr. Connors in the

16   courtroom?

17   A.   Yes.

18   Q.   Can you tell me where?

19   A.   Right over there.  He's wearing red, got the glasses.

20   Q.   Okay.  Thank you.  All right.  So how did you come into

21   contact with this confidential informant?

22   A.   We conducted a post-arrest interview out in Kirtland, at

23   the Kirtland substation.  Through that conversation, and

24   through his cooperation, he had described that he had a connect

25   that was located in Albuquerque, New Mexico.

1  Q.  What was the confidential informant in custody for?

2  A.  He was picked up with narcotics as well.

3  Q.  And so what did he say to you in the context of, well, I'm

4  under arrest and now I want to do something for you?

5  A.  Can you --

6  Q.  Let me rephrase that.  What information did he provide you

7  about Mr. Connors?

8  A.  He provided that basically that he knew a gentleman who

9  went by TC.  He had a phone number that he would contact him

10  on.  He described his residence in Albuquerque.  We were able

11  to pull up like GPS maps and get real close to that area of

12  what he described of where Mr. Connors resided at, and gave a

13  vehicle description as well.

14  Q.  All right.  What role did Mr. Connors have with this person

15  at least according to him?

16  A.  According to him, Mr. Connors was the one that was sourcing

17  him with the methamphetamine.

18  Q.  All right.  Did he provide you with any other information

19  at that time about Mr. Connors?

20  A.  Well, we did a photo lineup once we figured out that we

21  thought we had pinpointed now who Mr. Connors was throughout

22  our investigation.  And then he identified Mr. Connors in a

23  photo lineup prior to doing a controlled purchase.

24  Q.  All right.  Was it at this time, did you obtain any

25  warrants for tracking device or global positioning in the case,

1   or was that later?

2   A.   Sir, I believe, the best I can recall, we had that -- I

3   learned about Mr. Connors on like December 11th, and then

4   December 12th, we met back up with the confidential informant

5   to show him the photo lineup.  At that point in time, I was in

6   contact with our Intel analyst seeing if there was maybe any

7   money transfers or wire transfers, trying to identify his

8   residence in Albuquerque, and working with HSI agents at that

9   time, and, you know, then the phone number.

10       After doing some checks, we also revealed that the phone

11  number did come back as to a Terrence Connors, so we kind of

12  put TC and then Terrence Connors, that kind of came together,

13  and that's where we were at.

14  Q.   Is that how you obtained that photograph that you talked

15  about that you used in the lineup?

16  A.   The photograph comes through our Intel analyst, and then

17  they send us a photo lineup of six individuals, and we show

18  that to him after we read them, you know, a photo lineup

19  instructions sheet.

20  Q.   All right.  Were you involved in any of this surveillance

21  that took place in Albuquerque, or was that strictly with HSI?

22  A.   Not so much in Albuquerque, sir.  Ours was basically from

23  Farmington to the meet location for controlled purchase in

24  Cuba.  Then some of our agents did participate with that

25  operation or following him after the transaction.  But my role

1  after that was trying to fill out the paperwork and getting the

2  affidavits for like the GPS and for the tracker and stuff like

3  that.

4  Q.  Okay.  With regard to this confidential informant, did

5  you -- did you trust this individual?

6  A.  Well, trust is a...confidential informants are utilized in

7  different roles within our task force.  Some confidential

8  informants are for --

9         MR. ROBERT:  Objection, nonresponsive.

10        THE COURT:  Overruled.

11 A.  Some confidential informants are utilized --

12 Q.  (By Mr. Cairns)  Wait just a minute.  I apologize to you.

13 And I apologize to the court reporter.  When there is an

14 objection, make sure you wait until the court rules on the

15 objection, because in this particular case, the objection was

16 overruled, so you can continue to answer the question as you

17 were previously doing so.

18 A.  I apologize.

19 Q.  But wait for the court to rule on the objection before you

20 respond.

21 A.  Yes, sir.

22 Q.  I'm sorry, and I apologize to you.

23    Okay, so what were you saying about confidential

24 informants?

25 A.  Confidential informants are utilized in different roles

1   within our agency, so some are utilized for information, some

2   are used for controlled purchases, some will remain anonymous,

3   some are paid informants, and some are working for, you know,

4   trying to work off their charges or have a reduction, possibly,

5   in their charges.  That type of thing.

6       In this particular case, the confidential informant that we

7   utilized, we were verifying -- as fast as I was obtaining the

8   information, I was trying to verify whether or not this

9   gentleman did in fact exist, and was he in the Albuquerque

10  area, does this person drive this type of vehicle, that type of

11  stuff.

12  Q.   And so that's how you identified Mr. Connors?

13  A.   Yes.

14  Q.   I guess I'll go back, and Mr. Robert's objection probably

15  had some merit.  Let me ask you one more time, did you trust

16  this guy, or is that why you did all this extra work to

17  corroborate what he said?

18  A.   I have to -- we have to trust them to some extent, you

19  know, because sometimes we're going to be playing the role if

20  they are introducing us to their connect.  So there is a degree

21  of trust that does go on.  By any stretch of the imagination,

22  you know, but that's all it is, it is a working relationship.

23      We take precautions when we meet with these guys.  They are

24  searched down when we meet with them.  We always meet with them

25  in pairs.  We never meet with them alone.  We try to record

1    everything we're doing with them.  So...

2    Q.  All right.

3    A.  You know, it's yes and no.

4    Q.  I'll move on.  Now, you mentioned before that there are

5    paid informants.  Was this informant paid?

6    A.  No, sir.

7    Q.  And so what was his -- why was he working to help you?

8    What was he hoping to receive in anticipation of that?

9    A.  For consideration of his charges, his current charges.

10   Q.  That was the charge that he was arrested on?

11   A.  Prior, yes, sir.

12   Q.  And did in fact he receive any dispensation?

13   A.  Not at this time.  His case is still moving forward, sir.

14   Q.  In other words, the prosecution is moving forward?

15   A.  Yes.

16   Q.  Did this informant receive any other reward for the

17   information he provided to you?

18   A.  No, sir, he did not complete his contract with Region II

19   Narcotics.

20   Q.  I'm going to ask you one more favor.  It is just to benefit

21   the court reporter.  Wait until I finish, because if you talk

22   over me, it's going to be hard for the court reporter to record

23   what we're saying at the same time.  I'm sorry.

24   A.  No, I'm sorry.  I'm nervous.

25   Q.  I'm nervous, too.  All right.  So did you set up a

1    controlled buy through this confidential informant with

2    Mr. Connors?

3    A.  Yes, sir.

4    Q.  Let me ask you this.  Were some of those conversations

5    between the confidential informant and Mr. Connors, were they

6    recorded?

7    A.  Yes, sir.

8            MR. CAIRNS:  If I might approach, Your Honor.

9    Q.  (By Mr. Cairns)  I'm handing you what's been marked as

10   Government's Exhibit Number 5.  Now, it's a CD.

11   A.  Okay.

12   Q.  And actually, I don't need to hand it to you.  Did you

13   listen to this CD with me at the HSI office yesterday?

14   A.  Yes, sir.

15   Q.  And can you tell me what's on the CD?

16   A.  One of the audio files is a recording of the actual

17   transaction that had taken place, and then there is another

18   audio file with a recorded phone call as well.

19           MR. CAIRNS:  I move for the admission of Government's

20   Exhibit Number 5.

21           THE COURT:  Any objection, counsel?

22           MR. ROBERT:  No objection, Your Honor.

23           MR. SAMORE:  Not for purposes of this hearing, Judge.

24           THE COURT:  All right.  It will be admitted.

25       (Government's Exhibit 5 admitted.)

1          MR. CAIRNS:  Your Honor, you're probably aware that in

2    Mimbres Courtroom there is no electronic equipment in here.

3          THE COURT:  I see that.

4          MR. CAIRNS:  So I brought my own.  So with the court's

5    permission, let me go ahead and --

6          THE COURT:  Thank you for doing that.

7          MR. CAIRNS:  Actually, it is my benefit to do it, Your

8    Honor, because that's how I --

9          THE COURT:  Well, thank you for that.

10         MR. CAIRNS:  I've tried many cases in this case.  Not

11   many, I would say three or four.  But Judge Hansen, Judge

12   Parker, sit in here, and I asked Judge Hansen once why he

13   doesn't have electronic equipment in his courtroom, he told me

14   it was age discrimination.

15   Q.  (By Mr. Cairns)  I'm going to play this through once, then

16   I want you to listen to it again and when we get done, I want

17   you to tell me what's happening in the conversation.

18   A.  Yes, sir.

19        (Recording played.)

20   Q.  (By Mr. Cairns)  Okay.  First of all, tell me, how was this

21   recording made?

22   A.  Through a digital recorder, like what we call a wire, a

23   little wire.

24   Q.  Okay.  And can you give me the general time frame as to

25   when this recording was made?

1   A.   I would have to refer to my report, but I believe that that

2   was taken on December 13th, if I recall correctly.

3   Q.   Were you present when the recording was made?

4   A.   Yes.

5   Q.   Do you recognize the voices on this recording?  Or at least

6   one of them?

7   A.   Yes, the confidential informant that was utilized in this

8   case.

9   Q.   And is the other -- who does the other participant appear

10  to be?

11  A.   I believe he was talking to Mr. Terrence Connors.

12  Q.   Why do you believe that?

13  A.   Just through our investigation, and that phone number that

14  it came back to, the photo lineup that we did as well.  That

15  led me to believe that that was the individual our confidential

16  informant was speaking with.

17  Q.   So is the phone number that he's calling here, or the phone

18  number that's calling in, is that Mr. -- the number that you

19  associate with Mr. Connors?

20  A.   Well, the original phone number that we had that he was

21  contacting him on was one of them.  But then also through the

22  investigation, he advised our confidential informant to contact

23  him on another phone number.  So throughout our investigation,

24  there was two separate phone numbers that the confidential

25  informant would make contact with Mr. Connors.

1    Q.   Is this one of them?

2    A.   One of those, yes, sir.

3    Q.   All right.  Now, tell me what's happening during the

4    conversation.  You don't need to go through the extraneous, the

5    unrelated stuff, but kind of what the gist of the conversation

6    was.

7    A.   The gist of the conversation was to have our confidential

8    informant to contact Mr. Connors and let him know that he had a

9    portion of his money for him, and we were trying to ascertain

10   that if Mr. Connors was going to let him know that if he was

11   going to be leaving any time soon to pick up a suspected load

12   of methamphetamine.

13        During the conversation, he advised our confidential

14   informant that he was -- he had placed his order, and also

15   during the conversation, he said that, "Well, I'll try to swing

16   back through your area" once he completed his order, picked up

17   his order.

18   Q.   Okay.  Is that an order for methamphetamine?

19   A.   Yes, sir.  I took that to be that he would pick up the

20   methamphetamine, and after he had picked it up, Mr. Connors was

21   going to swing back through the Farmington area to pick up the

22   money we advised our confidential informant that he had to pay

23   that portion off and receive more methamphetamine.

24   Q.   Okay.  At this point in time, did you have an understanding

25   as to where Mr. Connors was picking up the methamphetamine

1    from?

2    A.   We believe it was going to be from the Phoenix area.

3    Q.   Where did you --

4    A.   Phoenix is a source area.

5    Q.   I'm sorry, my fault.  Okay.  Did you have any other

6    information that would lead you to believe that he was going to

7    Phoenix other than that it is a source city?

8    A.   Through the conversations and through the controlled

9    purchase, we had learned that he was -- it was logical that he

10   was going down to that area of Arizona, and so that's what led

11   me to believe that that's where he was heading.  Also, the

12   confidential informant advised that he believed that was

13   probably where he was going to be picking up his suspected load

14   as well.

15   Q.   Okay.  So did you set up this controlled buy of narcotics

16   from Mr. Connors?

17   A.   Yes, sir.

18   Q.   How did you do that?

19   A.   I had met with -- well, my partner and I met with the

20   confidential informant.  When we met with him, we searched him

21   and his vehicle, and then we -- he advised us -- is that what

22   you're asking for?

23   Q.   Give me a general time frame as to when this occurred.

24   A.   It occurred on December 12th.  I would have to look at the

25   exact time, but maybe 1900 hours or somewhere in there.

1   Q.   How do you know that Connors had narcotics to sell to the

2   confidential informant?

3   A.   The confidential informant advised me that he could

4   purchase some methamphetamine and that TC, or his connect,

5   Mr. Connors, wanted to meet in Cuba for the -- to conduct the

6   purchase.

7   Q.   Is that information that he relayed to you from phone

8   conversations that he had had with Mr. Connors?

9   A.   Yes.

10   Q.   And so now give me the protocol for the controlled buy.  We

11   know how it came to be, how it's been set up logistically; but

12   tell me what your protocol is when you are initiating a

13   controlled buy through a confidential informant.

14   A.   Our protocol is that we'll meet with the confidential

15   informant.  There has to be two agents there.  We'll search him

16   and his vehicle, and the contents therein, and to make sure

17   that there is no large sums of money, drug paraphernalia,

18   anything like that, any type of illegal contraband, weapons,

19   that type of thing.

20       Then this particular buy, we'll put Region II contingency

21   funds in place.  Sometimes we'll go ahead and photocopy the

22   Region II contingency funds as well for evidence if we can

23   recover them later.  Then we'll provide continuous surveillance

24   on the confidential informant as they go to the meet location

25   and while the transaction is happening.

1  Q.  All right.  Do you also sometimes record these

2  transactions?

3  A.  Yes, sir.

4  Q.  And did in fact you record this one?

5  A.  Yes, sir.

6       MR. CAIRNS:  Now, this is the second of the two

7  conversations on the tape.  This is a much longer tape.  For

8  the court's convenience and the convenience of everybody in the

9  courtroom, I'm not going to play all of it.

10  Q.  (By Mr. Cairns)  Let me ask you, Officer, did you listen to

11  this tape yesterday with me?

12  A.  Yes, sir.

13  Q.  Can you tell me what takes place in approximately the first

14  15 minutes of the tape?

15  A.  The very first 15 minutes?  It's basically -- you'll hear

16  music in the background, and basically, it's the confidential

17  informant driving to the designated meet location, which was

18  Cuba, New Mexico.

19  Q.  Okay.  You say there is music in the background.  Where is

20  that music coming from?

21  A.  It's coming from his radio, or from inside the vehicle.

22       THE COURT:  Let me ask you a question, Counsel.  Does

23  defense counsel have a copy of this?

24       MR. CAIRNS:  Yes.

25       THE COURT:  So they have already heard it.  So you

1    don't have any objection to him skipping over part of this?

2              MR. ROBERT:  No, Your Honor.

3              MR. SAMORE:  No, Your Honor.

4              MR. CAIRNS:  This was sent over in discovery earlier in

5    the case, and the other thing is that for the court's benefit,

6    I mean, this exhibit, you'll be provided with the entire

7    exhibit.  You're certainly welcome to listen to the entire

8    thing yourself.

9              THE COURT:  Thank you.  I just wanted to be sure.

10       (Recording played.)

11   Q.  (By Mr. Cairns)  So this is an example -- is this where

12   he's driving?  Can you hear the music?

13   A.  (Witness nods.)

14   Q.  Does he also get some phone calls while he's --

15   A.  Yes, sir.

16   Q.  And are those -- what are those phone calls in general?

17   A.  Some are just from other people that are contacting him,

18   and sometimes it can be our car contacting him.

19       (Recording played.)

20   Q.  (By Mr. Cairns)  I'm sorry to stop the tape.  I think you

21   hear him, "Do you want anything?"  He says, "I'm okay."  Is

22   that what he says?  Where is this taking place?

23   A.  This is taking place in Cuba, New Mexico, at the gas

24   station, like underneath the awning, the overhang, next to the

25   gas pump.

1  Q.  I'm sorry.  Is there like a convenience store there?

2  A.  Yes, a convenience store and McDonald's.

3     (Recording played.)

4  Q.  (By Mr. Cairns)  Okay.  Is the drug transaction concluded

5  at that point in time?

6  A.  Yes, sir.

7  Q.  Can you tell me -- it's hard to hear, and I apologize to

8  you and to the court.  Can you tell me what's happening during

9  this conversation?

10  A.  During the conversation, the confidential informant met up

11  with Mr. Connors at that time, at the rear of the vehicle.  At

12  that time, the confidential informant handed Mr. Connors a sum

13  of Region II contingency funds.  In return, Mr. Connors handed

14  him a package.  It was like a rubber keyboard that was rolled

15  up, and then inside of that rubber keyboard was a plastic bag,

16  and inside that was, like, I think it was wrapped up in some

17  tinfoil possibly, the narcotics were inside of that, the

18  suspected drugs were inside of that.

19  Q.  Okay.  While this transaction is taking place, are there

20  agents conducting surveillance of the transaction?

21  A.  Yes, sir.  Around the perimeter.

22  Q.  What happens afterwards, after the transaction is finished,

23  and then what's the protocol at that point in time?

24  A.  Agent Green and I followed the informant away from a

25  transaction to a safe location while the other agents who were

1    located there followed the target leaving the area heading back

2    towards Albuquerque.

3    Q.   Now, I think I may have asked you this question before.

4    You participated in the obtaining of other warrant, tracker

5    warrant, GPS, cell site information, warrant for Mr. Connors'

6    phone and Mr. Connors' vehicle?

7    A.   Yes, sir.

8    Q.   Who signed those warrants?

9    A.   A district judge in Farmington, New Mexico.

10   Q.   Were you involved in either the -- I'm just after -- I

11   don't think you were, but were you involved in either the

12   installation of the tracking device, or were you involved in

13   the cell site monitoring?

14   A.   I was involved in the cell site monitoring because when you

15   get a ping for that, it will send the GPS location to your cell

16   phone or to your phone.  So I was involved in that portion.

17   But as far as the installation of the GPS or the tracking

18   device, no, sir.

19   Q.   Based on that cell site information, did you learn that

20   Mr. Connors had gone on a trip someplace?

21   A.   Yes, sir.

22   Q.   Where was that?

23   A.   He went to an address in Phoenix, Arizona.  Or in the area

24   of Phoenix.  I don't know which town that was.  I mean, I'll

25   have to look at that.

1   Q.   Did he return from there to New Mexico?

2   A.   Yes, sir.

3   Q.   And at that point in time, was there a -- well, was there a

4   traffic stop in which Mr. Connors was arrested?

5   A.   Yes, sir.

6   Q.   Did you participate in that?

7   A.   Yes, sir.

8   Q.   But were you there at the beginning of that traffic stop?

9   A.   I was there.  It was almost simultaneous.  After the

10   vehicle was stopped, the K-9 arrived, and we basically -- I had

11   helped out with the traffic on the highway, basically with a

12   flashlight, you know, making sure that the vehicles could see

13   us and so they could get in the other lane.

14   Q.   You mentioned the K-9.  For the record, what is a K-9?

15   A.   The K-9 is a K-9 officer.  He has a K-9 that's trained

16   in -- for narcotics and stuff like that.

17   Q.   Is the dog trained in the detection of narcotics?

18   A.   Yes, sir.

19   Q.   So who owned this dog that was at that particular scene?

20   A.   Farmington K-9 Officer Dennis Ronk.

21   Q.   Was the K-9 present at the scene from the beginning of

22   traffic stop?

23   A.   Yes, sir.  Once the traffic stop was completed, we called

24   the K-9 officer over there immediately after the vehicle was

25   stopped.

1    Q.  How long did it take him to get there?

2    A.  Sir, it wasn't very long, because it was only a few -- they

3    were only a few miles away.  He was only two miles away.  It

4    wasn't a very long time at all.

5    Q.  Did you also participate later in the interview of

6    Mr. Connors?

7    A.  I did.  After the traffic stop, yes, sir.

8    Q.  But when did you come in on that interview?

9    A.  It was going towards the tail end, middle portion, tail end

10   of the interview.  I don't recall the specific time, sir.

11   Q.  But had that interview already begun?  Was it initiated by

12   other agents?

13   A.  Yes, sir.

14         MR. CAIRNS:  I think that's probably all the questions

15   I have at this time.

16         THE COURT:  Cross examination, Mr. Samore.

17                        **CROSS EXAMINATION**

18   **BY MR. SAMORE:**

19   Q.  Mr. Verhulst, did I pronounce that correctly?

20   A.  Yes, sir.

21   Q.  Is that a Dutch name?

22   A.  Yes, Dutch German, yes.

23   Q.  Are you presently employed working for the State of New

24   Mexico?

25   A.  San Juan County, sir.

1    Q.   San Juan County.

2    A.   Yes, sir.

3    Q.   And you were employed by San Juan County at the time of

4    this incident.   Am I correct?

5    A.   Yes, sir.

6    Q.   All right.   Have you ever testified in federal court

7    before?

8    A.   Yes, sir.

9    Q.   Now, prior to making -- pardon me, prior to the stop that

10   you just concluded your testimony describing, you had the

11   opportunity to review the NCIC and any other criminal record of

12   Mr. Connors, didn't you?

13   A.   I don't understand that question, sir.

14   Q.   I'll back it up a little bit, then.

15   A.   Okay.

16   Q.   You had never met Terry Connors before this stop, had you?

17   A.   No, sir.

18   Q.   And you told the court, I believe, that you were present at

19   the time of this buy where you have a recording involving the

20   CI, and you were also present at the time he was stopped in

21   traffic on December 17th?

22   A.   Yes, sir.   On both of those occasions, I was present, yes,

23   sir.

24   Q.   All right.   Now, we can agree that the CI's name is ███████

25   █████████.

1           MR. CAIRNS:  I would like to object just a moment, if

2    we could approach or just be off the record for a moment.

3           THE COURT:  We'll be off the record for just a moment.

4       (Off the record.)

5           THE COURT:  You can move to strike that from the

6    question, then.

7           MR. CAIRNS:  Thank you.

8           MR. SAMORE:  So just identify him as the CI.

9           THE COURT:  You can strike the record.

10   Q.  (By Mr. Samore)  We can agree that, prior to working with

11   you, the CI had accumulated a rather significant criminal

12   record, hadn't he?

13   A.  Yes, sir.

14   Q.  And as far as you knew prior to December 17, Terry Connors

15   had zero criminal record, didn't he?

16   A.  I don't recall that, sir.  I don't remember the exact

17   criminal history.

18   Q.  Are you telling the court you never checked Terry Connors'

19   criminal history prior to December 17?

20   A.  I did the inquiries on him, and we went through our intel

21   analyst.  I'm trying to remember exactly everything we had

22   pulled on him.  We did the registration, some registration

23   queries.  We did some money order, like queries, the telephone

24   checks, the utility checks.  But that was all in conjunction

25   with HSI and the Region II Narcotics Task Force, trying to

1    ascertain as much information about Mr. Connors at that time.

2        I don't remember or recall if I actually had a Triple I ran

3    on Mr. Connors at the initial portion of the investigation,

4    sir.

5    Q.  Since December 17, have you had the opportunity to review

6    his criminal record?

7    A.  No, sir.

8        MR. SAMORE:  May I ask a question of the witness

9    regarding other names that were used by the CI?

10        THE COURT:  I don't see a problem with that.  Do you

11   have a problem with that?  Are these other names that need to

12   be protected?  That's my only concern.

13        MR. SAMORE:  These are just first names or nicknames.

14        MR. CAIRNS:  I don't have an objection to that.  I

15   think they are just other aliases he might have.

16        THE COURT:  That's fine.

17   Q.  (By Mr. Samore)  Did you know that the CI ever went by the

18   name of Richard or Shorty?

19   A.  The confidential informant utilized in this case, sir?

20   Q.  Yes.

21   A.  Yes, I believe that he has an alias or a moniker of Short

22   Dog.  Something to that effect, yes, sir.

23   Q.  What about "Richard"?

24   A.  No, I -- he's referred to as Shorty, and to my

25   recollection, his brother is referred to like T-bone, something

1    like that, you know.  Those are the nicknames.

2    Q.  My colleague from the government just described to the

3    court how this gentleman has been identified by name in the

4    record.  I'm going to ask you a couple of questions about the

5    arrangement that you had with him prior to my client's arrest.

6    A.  Okay.

7    Q.  The first question is did he have an attorney representing

8    him when he negotiated or came to any agreement to work with

9    you?

10   A.  No, sir.

11   Q.  Was he in custody at the time that he came to this

12   arrangement with you?

13          MR. CAIRNS:  Your Honor, I think that's a legal

14   opinion, and the other, I'm not sure what the relevance of this

15   inquiry is.

16          THE COURT:  I think it's relevant.  Can you rephrase

17   what you mean by "arrested"?  Was he in jail?

18   Q.  (By Mr. Samore)  When he came to this agreement with you to

19   work, as you described in your direct testimony, was he in a

20   jail setting?

21   A.  In our initial meeting with the source at this time, we met

22   at the Kirtland substation, and, yes, he was in custody at that

23   time.

24   Q.  All right.  And he was facing criminal charges.

25   A.  Yes, sir.

1   Q.   Do you remember what those criminal charges were at the

2   time he negotiated this deal with you?

3   A.   Trafficking in controlled substance, sir.

4   Q.   We know from his record that he has quite a number of these

5   prior arrests or convictions for this trafficking or drug

6   issue.

7   A.   Yes, sir, he has a lengthy criminal history.

8   Q.   Did you or someone on your behalf in law enforcement come

9   to a written agreement with the CI?

10  A.   Yes, sir, there is a contract for working with Region II

11  Narcotics Task Force.

12  Q.   Have you provided that contract to the United States

13  Government?

14  A.   Sir, I provided -- I provided a lot of information, sir.

15  You know, I would have to look at the record, sir.

16  Q.   I'm going to make a statement of counsel on the record

17  because this is a hearing.  The defense, neither attorney, has

18  a copy of that agreement.  So I'm going to try to ask a few

19  questions about that agreement because I don't know what's in

20  it.  All right?

21  A.   Yes, sir.

22  Q.   All right.  Thank you.  The first question is going to be,

23  does that agreement in one of the terms -- it is probably a

24  written form, isn't it?  Then you check certain boxes on the

25  side, something like that, or check certain blank lines to make

1   sure that the person has read it all and then you both sign,

2   something like that, isn't it?

3   A.  Yes, sir.  There is also an actual form where we read off

4   the rules.  There is like 10 items that they will initial,

5   like, I'm not -- I can't act as a law enforcement officer.  I

6   will not carry -- that type of stuff, all the way through.  We

7   explain entrapment, you know, that type of stuff on there.

8   Q.  You and I are understanding each other completely.  Thank

9   you.  Those are some of the terms I'm going to ask.  One of

10  those terms is that he's not supposed to violate any other laws

11  when he's working in this capacity unless it's with your

12  knowledge doing, for example, a controlled buy.

13  A.  That is correct, sir.

14  Q.  Another one is he's not supposed to take illegal drugs, is

15  he?

16  A.  Without the direction from the task force.  If that's what

17  you're asking, sir.

18  Q.  I think that's a fair answer.  Sure.  He might get in a

19  situation where he almost would have to smoke dope, for

20  example, rather than betray that he's working for the

21  government.  I'm just creating an example, not specifically

22  this case.  That's one of the situations where, to maintain his

23  cover, he would have to participate, perhaps, in illegal drug

24  actions.

25  A.  That is not uncommon, but when we talk with our

1   confidential informants, we talk about stuff like that.  What

2   is your excuse going to be?  Oh, crap, I've got to meet with my

3   PO officer.  I can't right now, I've got a really good job

4   interview.  You have to have a quick response to that type of

5   stuff, yes, sir.

6   Q.  Now, we've heard a couple of recordings of him today, and

7   he sure seems like a happy guy in counsel's opinion.  He's

8   laughing in both of those conversations, isn't he?  Do you hear

9   that today?

10  A.  I mean, I heard the audios.

11  Q.  You would agree that he kind of laughs his way through the

12  conversation with Mr. Connors, and he laughs his way through

13  the conversation, the second conversation.  Did I describe that

14  pretty accurately?  A lot of laughter by him, Mr. CI.

15  A.  Nervous -- there was some laughter there, yes.

16  Q.  There wasn't any laughter from Mr. Connors, and there

17  wasn't any laughter from the other person who was talking to

18  the CI, was there, in either conversation?

19  A.  Can you restate the question?

20  Q.  I'm just asking if you recall any laughter from either of

21  the other participants --

22  A.  I think they just had a conversation between the two

23  people, you know.  Meeting up and talking.

24  Q.  You've had other conversations with him that weren't

25  recorded that we didn't hear this morning, haven't you?

1   A.  Yes, sir.

2   Q.  Now, I'm going to turn your attention to the date when

3   this -- we're going to call it the controlled buy occurred, the

4   buy of December 12, I think, where my client was supposed to be

5   involved, all right?

6   A.  Yes, sir.

7   Q.  You had checked prior to the control buy, you checked the

8   CI to see if he had any weapons or money on him?

9   A.  Yes.

10  Q.  Didn't check to see if he had any drugs in his system, did

11  you?

12  A.  No, sir.

13  Q.  You kind of are trusting him that he's going to come to

14  that deal and not have any drugs in his system.

15  A.  Yes, sir.

16  Q.  Even though you're aware that he has a long record for

17  probation violations, parole violations, failure to appear,

18  drug possession, that's one of those things you have to trust.

19  A.  Yes, sir.

20  Q.  Okay.  Now, we're also kind of having to trust -- and I

21  certainly do trust you in your recollection of whatever this

22  agreement was, written agreement that you had that I've never

23  seen.  You were signatory to that agreement, weren't you?

24  A.  Yes, sir.

25  Q.  Anybody else on behalf of law enforcement besides you?

1   A.   It goes to our immediate supervisor, sir, and then they

2   will take a look at it, and we have to compile the packet of

3   information in there including, you know, a photo,

4   fingerprints, et cetera, that goes into that packet.   Then that

5   packet gets signed off on, and then he's assigned -- then I'm

6   assigned what we call a TF number, and then from that point on,

7   that confidential informant will be referred to as like, you

8   know, TF number 551, and that's how we keep track of the money

9   or the contingency funds that are utilized through the

10  receipts.   He'll sign his alias name, whatever name that is,

11  that he chooses, and then that way we keep it all together and

12  that is locked up in a safe, and the only access to that is my

13  supervisor and the secretary.

14  Q.   Do you remember the date or the approximate date when you

15  and he signed that agreement?

16  A.   No, sir, I would have to look at the agreement.

17  Q.   Do you have that agreement in the courtroom or maybe

18  outside the courtroom --

19  A.   No, sir.

20  Q.   -- to refresh your recollection?

21  A.   No, sir, I don't have that with us.

22  Q.   Didn't bring it to court with you today?

23  A.   No, sir.

24  Q.   Did you review it in the last week, prior to this very

25  moment, to prepare for your testimony?

1   A.   The contract, sir?

2   Q.   Yes, sir.

3   A.   No, sir.

4   Q.   What else is in that packet besides the contract that you

5   have with Mr. CI?  Can you just identify the documents?

6   A.   Basically, the initial page is name, date of birth, if he

7   has a job, tattoos, where he's living, all of the pertinent

8   information, how tall, weight, that type of stuff.  Then there

9   is another page of immediate family members that they would

10   tell us that live in the area, that type of thing, as just in

11   case we need to get in contact with them, or if we lose touch,

12   we have a starting point of that portion of that.

13        Then there is also another page where, you know, there is

14   some questions within that, you know.  Driving history,

15   license, the vehicle that he drives, that type of stuff.  So

16   there is a lot of different, little, small bits of information.

17        The main one is going to be the actual rules of the

18   contract, and he initials each one of them that he reads, and

19   we read together, and we kind of go over that type of stuff.

20   Then he signs that, and then we ask them to make up a name,

21   whether that be a president or a cartoon or whatever, and then

22   he'll tell us, I want to be called Salsa, and then we'll have

23   him present Salsa, and then have him sign Salsa.  And that's

24   basically what he signs his -- when we give them money to go

25   ahead and purchase narcotics, he'll sign a receipt Salsa, and

1    then we'll put the TF number next to that, he's TF 551, that

2    way, you know, it will be kept together in one file.

3    Q.   Now, who has access to that file information of the CI

4    besides you?

5    A.   The only access once that gets in is going to be the

6    director of Region II Narcotics Task Force, which is Neil Haws,

7    my sergeant, Phil Goodwin, and our secretary has the keys and

8    access to the files and everything within the safe.

9    Q.   If Mr. Cairns, for example, or someone from the United

10   States Attorney's Office wanted to just go take a look at that,

11   could they go to Farmington, or wherever it is kept, and take a

12   look at it, or would they have to get permission from someone

13   at your office?

14   A.   No, sir, the procedure, you would request that information,

15   and then that information would be requested through the

16   attorney's office or whatever, and then our supervisor would

17   take a look at that along with the secretary.  Then they would

18   ask, "Okay, this confidential informant for this particular

19   case has been formally requested to be disclosed."  And then we

20   would talk about, "Okay, that's fine with us.  Let's go ahead

21   and disclose them."  And then you would request that

22   information, and we would pull that packet, and then that

23   packet would be redacted.  So, like, all the pertinent

24   information about his personal stuff, that would be redacted,

25   blacked out, and then they make a copy of a copy of that, and

1    that's what would basically be sent to the office.

2    Q.  Or even if it were the United States Attorney's Office, he

3    would probably get a redacted copy as well, wouldn't he?

4    A.  Yes, sir.  Also, with the -- depending on how many buys an

5    informant participated in, there is like a carbon copy, so you

6    have the original, a pink sheet and a yellow sheet underneath

7    that, and that information also would be redacted.

8    Q.  What about the --

9    A.  So you couldn't see the case numbers or that type of stuff,

10   sir.

11   Q.  I'm sorry.  What about the Attorney General of the State of

12   New Mexico?  If he or she were attempting, wanted to look at

13   that file, would the same procedure have to follow where it

14   would be redacted, or you would review it, even if it is the

15   Attorney General?

16   A.  If it's -- I've never had that happen.  I don't know.

17   Q.  What you're convinced --

18   A.  That's the procedures that we go through, sir.

19   Q.  I appreciate very much your obvious knowledge and honesty

20   in describing this to us.  What certainly is emerging to this

21   attorney is that this information is pretty sensitive, pretty

22   important.  You don't want it slipping out to just anyone.

23   A.  That's correct.

24   Q.  When Salsa, or whoever the person is, the CI, provides

25   information on other -- gets someone else arrested or doing

1  what they are probably supposed to do as far as their

2  agreement, does that go into the permanent file, showing that

3  they got -- we picked up Mr. X and Ms. Y and Mr. Z?

4  A.  Can I -- okay, if what you're asking is if a CI does a -- a

5  particular CI does five different cases with us, in that file,

6  there will be five separate receipts with five different dates

7  and five different case numbers, and amounts and so forth.  So

8  there will be different yellow receipts in that file for those

9  separate buys.  It is not going to say that on this date and

10  time he bought from Joe number 1 and Joe -- you know what I

11  mean?  It is just going to be a case number, a date, the amount

12  spent, and then at the bottom, it will be evidence and then a

13  comment like meth, cocaine, marijuana, pills, hydrocodone, the

14  amount.  Then over to the side, it would be the total amount

15  spent for that transaction.  And if the confidential informant

16  utilized in this case is being paid by -- with money, then

17  there is also a little line item, he was paid $100 for this

18  particular controlled purchase.  So you would have purchase of

19  evidence was $400, and then payment to CI or confidential

20  informant was $100, total amount paid, $500, and then we

21  subtract that from our running total of how much cash that we

22  have in the book at that particular time.

23  Q.  If we were trying to assess the reliability of this CI or

24  any CI, the record you have just described would be pretty

25  helpful in seeing if they are cooperating and fulfilling the

1  terms of their written agreement, wouldn't it?

2  A.  Yes, sir.

3  Q.  I'm not asking you now to disclose the file.  I'm just

4  trying to go through the process.  That's why I'm taking the

5  court's time and counsel's time to ask these questions.

6     Did this CI give information that led to the arrest or

7  prosecution of anyone besides these two gentlemen?

8        MR. CAIRNS:  Objection, Your Honor.  We're getting into

9  other cases, and this could actually endanger other

10 investigations.  Potentially other defendants who might be far

11 more dangerous than Mr. Connors and Mr. Jones could be apprised

12 as to the information.  Not only that, but I don't see the

13 relevance of it.

14       THE COURT:  What's the relevance?

15       MR. SAMORE:  Trying to assess the reliability of the

16 information that's being given by this gentleman as preliminary

17 to whether the warrant is sufficient.  I think Mr. Verhulst has

18 been very --

19       THE COURT:  How about if he just answers yes or no to

20 that question.

21       MR. SAMORE:  Sure.

22       MR. CAIRNS:  Yes, Your Honor, that's fine.

23 A.  Can you restate the question?

24       MR. SAMORE:  I'm going to have to ask the court

25 reporter to read it back.

1      (Question read.)

2   A.   He has.

3   Q.   (By Mr. Samore)   Nevertheless, I think we've been informed

4   prior to this hearing by my colleague for the government -- I

5   think he asked you that question.   This gentleman, the CI, has

6   been -- what's the word, kicked out of the program, removed

7   from the program, for violations?

8   A.   Yes, he did not complete his contract, sir.

9   Q.   What violations has he committed?

10           MR. CAIRNS:   Your Honor, again, I think that we're

11  getting into the actual contents of the CI file which the

12  government has not agreed to disclose.   That's a separate

13  battle.

14           THE COURT:   Counsel, I'm going to sustain that

15  objection at this time.

16  Q.   (By Mr. Samore)   Let me approach the area, pending

17  objection and the court's ruling, in a different way.   Do you

18  remember every term of the written agreement that this

19  gentleman, Mr. CI, signed with you?

20  A.   No, sir.

21  Q.   The terms would vary by whoever the CI is, wouldn't they?

22  A.   Motivational terms or --

23  Q.   I meant the written terms.   I'm only asking the written

24  terms.

25  A.   It is the standard contract, sir, and then there is a

1  portion or a paragraph on there that, you know, of why are you

2  wanting to work with Region II Narcotics.

3  Q.  Now, I'm going to go into a final few questions, then

4  conclude my cross.

5      Do you have any information yourself that my client

6  personally made any money whatsoever from any of the alleged

7  deals he was involved in?

8  A.  During the transaction in Cuba, he was given a large sum of

9  Region II contingency funds.  As far as anything else, I...I

10  don't know, sir.

11  Q.  You don't know if the amount that he was given went

12  entirely to someone else.  But you do know that he received

13  money, I think, can we agree on that?

14  A.  Yes, sir.

15  Q.  Let's turn to a quick question or two on the actual

16  agreement, I believe, that you were -- pardon me, the

17  controlled buy.  I believe your complaint that was signed by

18  you says you observed Mr. Connors and Mr. CI on December 12th

19  making some kind of a drug deal.  Is that correct?

20  A.  Agents did observe that.

21  Q.  Do you recall what the -- just generally, anyway, what the

22  CI was wearing that day?

23  A.  No, sir.

24  Q.  Okay.  What has me puzzled is that there is a reference

25  that he was -- I'm happy to provide you page 207 of discovery

1   is where I found it, that the CI was handed a rubber keyboard

2   and put it in his pocket.  Do you remember that reference?

3   A.  Yes, I believe it was the right front pocket.  Is that what

4   was mentioned?

5   Q.  That's exactly the reference I have.

6   A.  Yes, sir.

7   Q.  I thought a keyboard is pretty good size.

8   A.  It is a rubber keyboard, kind of looked like a burrito, so

9   to speak.

10  Q.  Now I understand that passage, because I was trying to

11  place that with the drugs that are supposed to have gone in.

12      All right.  Let's turn to that stop that occurred on the

13  highway.  Do you remember where that stop occurred or at what

14  time?

15  A.  That occurred in Gallup, and it was near -- it was like

16  near the overpass area.  It was very narrow on both sides of

17  the highway.  I recall that, yes, sir.

18  Q.  Who was present besides -- at that stop besides you?

19  A.  There was a couple other agents from our department.  Then,

20  of course, the Farmington K-9 officer arrived later on, and

21  then it was special agent with Homeland Security Chris was

22  there, and then I don't recall the other gentleman's name.

23  Q.  How many vehicles, law enforcement vehicles?

24  A.  At the time of the stop, there was a couple.  Then ours

25  rolled up.  We blacked out behind that, you know, waiting for

1    everything.  And there was a delay in that.  I don't recall,

2    sir.  There was some vehicles lined up in the back over there.

3    Q.  In addition to the three you just described, the dog

4    vehicle would have come with Officer Ronk.  Isn't that true?

5    A.  Yes, sir.

6    Q.  I believe my colleague asked this question, and I'm going

7    to -- I don't think you gave -- this is what gives counsel

8    concern for some later questions.  Once the traffic stop was

9    completed, were you on site at that time?  Right then, that

10   moment?

11   A.  When it was completed, I looked at it like they have

12   already taken Mr. --

13   Q.  Thank you, let me rephrase the question.  That's a very

14   good point.  From the time my client's vehicle was stopped, do

15   you know approximately what time or how many minutes passed

16   before you were brought on scene?

17   A.  I can give you an approximate, sir.

18   Q.  That's all I'm asking.

19   A.  Probably 10, 15 minutes.  It wasn't very long.

20   Q.  Where were you when you got the call on the stop?

21   A.  Well, we were actually -- we went further out past Gallup

22   to try to identify the vehicle that Mr. Connors was in so we

23   could get on that as quickly as possible.  So we could relay

24   the information back to the units that were in Gallup saying,

25   "Okay, we found the vehicle.  They are at this mile marker.

1  Okay, this is the right plate number."  That type of thing.

2  "Okay, it's coming your way.  We'll be there in a couple of

3  minutes."  That type of thing, sir.

4  Q.  You were further east than where these gentlemen were

5  stopped?

6  A.  Yes, I believe Agent Prince was further out.  He was

7  probably, approximately, about 20 miles out is when we picked

8  up Mr. Connors' vehicle coming back into Gallup.  That's when

9  we identified it, okay, that's the right vehicle.  Then as it

10  got closer, we were calling out on the radio, "Okay, we're

11  passing this mile marker.  Okay, yes, that's the vehicle," that

12  type of thing.

13  Q.  So if the reports that I have read reflect that the vehicle

14  was stopped at mile marker 22, you would have been out around

15  mile marker 40?

16  A.  No, sir.  We went out that far.  Then once we were able to

17  find the vehicle, we got in behind it and were, you know,

18  conducting surveillance of that vehicle as it got closer into

19  Gallup.

20  Q.  You were driving behind the vehicle that was driven by

21  Mr. Jones?

22  A.  One of the agents at one point in time, we were.

23  Q.  I'm just trying to understand how it is 10 to 15 minutes

24  from the time the vehicle stopped until you get on site.  I

25  thought you said --

1  A.  Yeah.  I mean, we were all in that general area, sir.  I

2  mean, I can recall that I passed by the traffic stop and we

3  turned around and come back in waiting to make sure that, okay,

4  that he was cleared from the vehicle and that type of stuff.

5  Then we would come back on there.  It wasn't very long.

6  Q.  Did you prepare your own report about that stop?

7  A.  I did a supplemental report of that, sir.  I believe it is

8  dated on the 17th.  It just describes that traffic stop and

9  basically what was seized from that traffic stop, sir.

10  Q.  Your basis for -- pardon me, our clients were arrested, or

11  at least my client was, on the basis of that arrest warrant,

12  wasn't he?

13  A.  I mean, within the totality of the whole situation.  That

14  was a portion of that, yes, sir.

15  Q.  You swore out an arrest warrant, and did you later swear

16  out a search warrant or just the arrest warrant?

17  A.  Just the arrest warrant.

18  Q.  All right.  Then, do you know where Officer Ronk was with

19  the dog at the time the vehicle was stopped in traffic?

20  A.  He was near the highway entrance to get onto -- to get onto

21  the highway.  Gallup is a pretty small spot.  You know.  So he

22  was there in that general area, and then he was called in, and

23  he just jumped up on there and got in behind us.

24  Q.  And he arrived after you, though?

25  A.  Again, we were all in that area.  I can't give you like --

1    he was there with those guys, and then I was also there because

2    I was helping with the traffic of that, because having the dog

3    on the highway with not a lot of space of a pullout, it was

4    making sure that the semis and stuff like that were moving

5    around while the HSI agents and the K-9 were conducting their

6    investigation, sir.

7              MR. SAMORE:  Thank you, Officer, for your attention.

8    Pass for further examination.

9              THE COURT:  Mr. Robert?

10             MR. ROBERT:  Thank you, Your Honor.

11                      **CROSS EXAMINATION**

12   **BY MR. ROBERT:**

13   Q.  Well, I'm going to start where you guys finished, Agent.

14   Is that the proper way to address you?

15   A.  Yes, sir, or Verhulst, Devin.

16   Q.  Verhulst, Devin.  Like Mr. Samore, I'm trying to get my

17   head around sort of the logistics, the chronology of what

18   happened when.  I looked at -- I'm sure that you looked at the

19   various reports that had been prepared and submitted in

20   connection with that stop on the 17th of December of last year.

21   A.  I've looked at my report, sir.  I helped get the K-9

22   officer's report over as well.

23   Q.  So you looked at his report?

24   A.  I looked at some reports, yes, sir.

25   Q.  You looked at Officer Ronk's report?

1   A.   I mean, I retrieved that report so I could forward it as

2   part of the case file, sir.

3   Q.   Have you looked at Officer Ronk's report?

4   A.   I have.  I don't recall a lot of...

5   Q.   That's fine.  Officer Ronk is a Farmington Police

6   Department K-9 handler, right?

7   A.   Yes, sir.

8   Q.   Farmington is a good distance from where this stop

9   occurred?

10   A.   Yes, sir.

11   Q.   All right.  So I think in his report, he says he was

12   contacted at, I think he said, 1700, which is five o'clock.

13   No, I'm sorry, 1930, so that's 7:30 p.m., right?

14   A.   1930, 7 and 12, yeah.

15   Q.   And the stop -- help me.  If I'm wrong about any of this or

16   you have a better sense of the timing of it, let me know; but

17   in looking at the report, it looks like somebody first picked

18   up the vehicle about ten o'clock, 2200, this is the vehicle

19   that Mr. Connors and Mr. Jones were in that was stopped near

20   mile marker 22.

21   A.   Okay.

22   Q.   Okay.  It seems as though in the reporting that somebody

23   said that there was visual contact of that vehicle made at 2200

24   about, ten o'clock.  Okay?

25   A.   All right.

1  Q.  Is that right, or is that not?

2        MR. CAIRNS:  I'm sorry, Your Honor, again, I realize

3  the Rules of Evidence don't apply here, but I would ask

4  Mr. Robert to ask questions instead of trying to cross-examine

5  with the witness about reports that he didn't provide.

6        THE COURT:  Just say you don't know or don't remember

7  if you don't know.

8  Q.  (By Mr. Robert)  The question, was the vehicle first

9  visually observed by one of the officers involved in this

10  operation on December 17th at about ten o'clock that night?

11  A.  I don't know, sir.  I don't recall.

12  Q.  The stop was made at about quarter of 11:00, 10:45?

13  A.  I don't recall.

14  Q.  Do you have your supplemental report with you?

15  A.  I think it is outside in my vehicle.

16  Q.  Do you have anything that might help you refresh your

17  recollection about this thing that happened 10 months ago, nine

18  months ago?

19  A.  No, sir.

20  Q.  Okay.  Do you remember what time it was that you arrived on

21  the scene of the stop?

22  A.  No, sir.

23  Q.  Okay.  Do you remember --

24  A.  It was dark out, sir.  It was dark and cold.

25  Q.  Okay.  Watches work in the dark and the cold, don't they?

1          THE COURT:  Mr. Robert, do you have anything that would

2   help refresh his recollection so we can move this along?

3          MR. ROBERT:  Part of the problem is I have some

4   reports.  I don't have his supplemental, so, no, I don't have

5   that, and I wish I did, because it might provide some

6   additional information.  But in terms of providing this officer

7   with something that he prepared that's relevant to these

8   questions, no, I don't.

9          THE COURT:  Mr. Cairns, do you know if you have that

10  report?

11         MR. CAIRNS:  I know that I don't have it because I

12  disclosed everything that I have.  If this is relevant, perhaps

13  we should take a recess and give it to Mr. Robert.

14         THE COURT:  Can we do it as quickly as possible, say 10

15  minutes, if possible?  We'll wait for you.  Is your car far

16  away sir?

17         THE WITNESS:  It's just right down the street.

18         THE COURT:  We can make copies.  We'll take a quick

19  recess, then, thank you.

20     (Court recessed at 10:47 a.m. to 11:03 a.m.)

21         THE COURT:  Court is back in session.

22         MR. ROBERT:  Your Honor, I want to make it clear for

23  the record, I actually did have what I was provided.  It

24  doesn't -- when agent talked about a supplemental report, I'm

25  used to seeing it look like a supplemental report.  I didn't

1    have something I was envisioning based on the testimony.  I do

2    have the information that was provided to me.

3              THE COURT:  Great.

4    Q.  (By Mr. Robert)  It doesn't have anything about, for the

5    most part, the timing of things that happened on the evening of

6    December 17th of last year.

7    A.  That is correct, sir.

8    Q.  So you talked about the things that you did.  You went to

9    the Thrifty Car Rental place here in Albuquerque that morning.

10   A.  I did not, sir.

11   Q.  There is a reference to that in the thing that you

12   reviewed, your narrative of 12/17/2012, right?

13   A.  Yes, sir.

14   Q.  And then you made the general reference to the traffic stop

15   and the items that were seized during the traffic stop.

16   A.  Yes, sir.

17   Q.  Okay.  So I'm not going to try to pin down the timing of it

18   with you, though I do want to kind of get a general sense,

19   because I think we're left a little confused about geography

20   and maybe even about some aspects of the timing.  So the

21   vehicle was traveling from Arizona to Albuquerque, right?

22   A.  Yes, sir.

23   Q.  This is the vehicle that Mr. Jones and Mr. Connors were

24   stopped in --

25   A.  It was traveling from Phoenix to Albuquerque.

1    Q.    So west to east.

2    A.    Okay.

3    Q.    Right?

4    A.    I'm not good at directions.  You go down one way and come

5    back the other.

6    Q.    California is west, New York is east.  Phoenix is west of

7    Albuquerque, right?

8    A.    Okay.

9    Q.    Do you think that's right?

10   A.    I don't know I-40 west.  Is it I-40 West going down there?

11   Q.    If you're going to Arizona, it is west; if you're coming

12   back here, it's east.

13   A.    Okay, we're square.

14   Q.    Between Phoenix and Albuquerque is Gallup.

15   A.    Yes, sir.

16   Q.    And Gallup is about where the stop took place.

17   A.    Yes, sir.

18   Q.    Mile marker 22 is in the Gallup area.

19   A.    Yes, sir.

20   Q.    All right.  And it's my understanding that, when you were

21   talking to Mr. Samore, you talked about basically picking up

22   the vehicle by way of surveillance before the stop was made.

23   A.    Yes, sir.

24   Q.    And well before, I think is what -- is my impression of all

25   this.  In Arizona would be my specific question.

1    A.  It might be close to that, sir.  I mean, I don't know.  I

2    mean, I do recall we were pretty far out there.  We were trying

3    to set up -- you know, we would have agents -- one of the

4    agents was going to be the furthest one out, and then we had

5    another one a little bit not as far, and then -- so we just

6    wanted to create a zone to where we could pick that vehicle up

7    so it didn't get through what we were trying to do.

8    Q.  Was there anybody actually physically following at this

9    time, or was it just people stationed?

10   A.  There was people stationed, but once we got on the right

11   vehicle, sir, yes, we backed off, created some distance there,

12   and would be calling out, "This is where we're at."

13   Q.  Eventually, the vehicle was stopped after it crossed the

14   New Mexico-Arizona line and got to the Gallup area.

15   A.  Again, I don't know about the Arizona part, because I don't

16   think Gallup -- from Gallup to the Arizona border is 20 miles

17   out, it may be, but in that general area, you know.

18   Q.  Where are you ordinarily when you're working?  What's your

19   general beat?

20   A.  Farmington, Aztec, New Mexico.  You know, in Bloomfield,

21   all in that general area.

22   Q.  So that's north of where we're talking about here.  You're

23   not terribly familiar with I-40?

24   A.  Oh, we are.  We are.  But I mean, I want to be accurate

25   with you and not say --

1   Q.   I appreciate it.

2   A.   If it was near the Arizona border, I don't know.  I'm

3   saying approximately 20 miles out or so.

4   Q.   Are you aware that the mile markers zero out at the state

5   line and start from zero at that point and go up as you go

6   toward Albuquerque?

7   A.   No, sir.  I'm not aware of that.

8   Q.   Would you agree with me that mile marker 22, Gallup, is

9   about 20 miles this side of the Arizona border, or do you not

10  know?

11  A.   I don't know, sir.  I just call out the locations where

12  we're at and where we're going.

13  Q.   All right.  Again, I think there will be other witnesses

14  that we can talk about this with, so we won't pester you with

15  this anymore.

16       But I do want to know about the call-out to Officer Ronk in

17  Farmington.  That had to have occurred several hours before the

18  actual stop was made, didn't it?

19  A.   As a notification to him that we had an operation?

20  Q.   Yes, that he might be needed to participate in.

21  A.   Oh, yes, sir.  Yes, sir.  We'll call, and then we'll call

22  dispatch and find out, you know, who is the on-call K-9 units

23  for a particular time, or who's working that day, that type of

24  thing.

25  Q.   Okay.  And so you called well before the stop actually took

1  place to make sure that there was going to be a K-9 officer

2  available to you for that purpose.

3  A.  That call was made, yes, sir.

4  Q.  Do you remember about when?

5  A.  No, sir.

6  Q.  Okay.

7  A.  Usually, that's taken care of by our supervisor, sir.

8  Q.  Okay.  I want to talk a little bit about the CI.  I want to

9  nail a couple of things down.  Based on my reading of what I've

10  been given, your first encounter with this fellow was on

11  December 11th of 2012.  Is that correct?

12  A.  Right around there, yes, sir.

13  Q.  So he was under arrest, he was charged with some

14  trafficking offense, and he was in the police station in

15  Farmington?

16  A.  In Kirtland.  The Kirtland substation.

17  Q.  Okay.  So that's actually on the Navajo Reservation, right?

18  A.  No, sir.  That's in Kirtland, New Mexico, just outside of

19  Farmington.

20  Q.  Right.  Okay.  Kirtland, New Mexico, in the Four Corners

21  area near Farmington.

22  A.  Yes, sir.

23  Q.  And you had never met him before.

24  A.  I had known of him because of my being on the streets and

25  stuff like that, yes.

1   Q.   Then you had known of him as somebody who was involved in

2   the drug trade in some capacity?

3   A.   Yes, sir.

4   Q.   Somebody who was a drug user?

5   A.   Yes, sir.

6   Q.   Before December 11, 2012, you had no knowledge of this

7   fellow other than as somebody who is a user and maybe a seller

8   of drugs.

9   A.   Knowledge -- yes, sir.

10  Q.   He had never provided you with information about any other

11  case prior to the information that he provided in this case.

12  A.   That is correct.

13  Q.   You have never had an opportunity before this case to

14  establish any credibility or reliability on his part.

15  A.   This was the initial -- yes, sir.

16  Q.   So when you say that you had a level of reliability or

17  credibility or that you had some level of trust in him, it was

18  entirely based on the things that we're here to talk about.

19  A.   Yes, it was based on, you know, him giving us the

20  information and then us going out there and corroborating that

21  independently of him, and, you know, one thing to another thing

22  to the controlled purchase, everything to the accumulation of

23  the investigation.

24  Q.   Okay.   It's pretty easy for you to get criminal record

25  information on somebody, isn't it?

1    A.   I wouldn't -- yes, we can request Triple I's, and then you

2    have to explain to dispatch why you are requesting it, whether

3    that be for felon in possession or something like that, yes,

4    sir.

5    Q.   You do it all the time in the course of an investigation,

6    right?

7    A.   Request information?

8    Q.   Request Triple I information, criminal history.

9    A.   Yes, sir.

10   Q.   I'm sure that you did it with respect to Mr. Connors and

11   what you learned of his identity, Mr. Jones.

12   A.   I did -- I don't recall --

13          MR. CAIRNS:   I think that counsel is mischaracterizing

14   his earlier testimony, so I'm going to object to lack of

15   foundation to the question.

16   Q.   (By Mr. Robert)   Okay.   You testified on direct, maybe it

17   was on cross with Mr. Samore, that you don't remember whether

18   you ran a criminal history on this fellow, the CI, that you met

19   on the 11th and began to use as a CI on the 12th.   It's not

20   possible that you didn't --

21   A.   Can you restate that?   I thought you got it confused with

22   the CI versus Connors, sir.

23   Q.   Well, you talked about both, I think, on cross examination.

24   So let's break it down.   Let's talk about the CI.   You met this

25   fellow on the 11th of December, right?

1    A.   Approximately.  It might have been the night before, you

2    know.  Are you talking about the actual when did our

3    confidential informant get arrested or --

4    Q.   When you met him.

5    A.   Well, it was during a post-arrest interview, it was during

6    the interview at that time at the Kirtland substation.

7    Q.   Right.  And I think -- --

8    A.   The date on my report for the initial information that I

9    was provided by the confidential informant was December 11th,

10   sir, but I may have spoken -- he may have been arrested like

11   the night before, you know.

12   Q.   That's fine.  My question to you, sir, is when you first

13   met the guy.  I think you said December 11th when we talked

14   about it just a few minutes ago.

15   A.   Yeah, in and around there, yes, sir.

16   Q.   All right.  You became aware that you were considering

17   using him as a confidential informant around that time.

18   A.   That is correct, yes, sir.

19   Q.   I can't imagine that one of the first things that you would

20   do would not be to get a criminal history for this guy.

21   A.   That's part of the packet that we put together, is not only

22   the information packet, the photos, the fingerprint cards, the

23   Triple I, all of that is put together in the full packet.

24   Q.   All right.  So you did run a criminal history on the CI

25   around the time that you started using him for information.

1   A.   On the confidential informant, yes, sir.

2   Q.   All right.   So at that time, you knew that he had a

3   criminal history going back to 1996?

4   A.   It's a lengthy criminal history, yes, sir.

5   Q.   That included multiple DWIs, domestic violence, and

6   possession of drugs and trafficking, forgery.

7   A.   It's an extensive criminal history, sir.

8   Q.   Is that a yes?

9   A.   Yes, sir.

10   Q.   Several failures to appear in and violations of probation

11   or parole?   Yes?

12   A.   That sounds about right, without looking at his full

13   criminal history right here.

14   Q.   I have to ask you, though, one of the things we were

15   provided, first redacted form without identifying the

16   individual, then more recently with the name, and there were a

17   lot of records, a lot of references to various arrests.   One of

18   the things that's not on here, though, is an arrest around

19   December of 2012 for a trafficking offense.   What happened to

20   that case?

21   A.   It's still going on, sir.

22   Q.   Okay.   All right.   So he's still being prosecuted for

23   whatever it was that he was arrested for in December of 2012?

24   A.   Yes, sir, it was referred to --

25            THE WITNESS:   Right?   I mean...

1          MR. CAIRNS:  He's having difficulty with this because

2    it is currently -- there is currently a discussion as to

3    whether or not it will go federal or state.

4    Q.  (By Mr. Robert)  I don't care about that.

5    A.  It is moving forward, sir.

6    Q.  All right.  That's fine.  I was just curious as to why it

7    didn't show up.  There are things in 2013 that show up, FTA's

8    and stuff, and not this thing.  I was curious as to why that

9    was.  If you don't know why --

10   A.  I don't know, sir.

11         MR. ROBERT:  I recognize that the court ruled earlier

12   that there wouldn't be any conversation about the specifics

13   about why this CI was terminated.

14         THE COURT:  Not at this time, Mr. Robert.  We can

15   address that at the end of this motion to suppress, but I think

16   we have four more witnesses we need to get to.

17         MR. ROBERT:  That's fine, Your Honor, I appreciate

18   that.

19   Q.  (By Mr. Robert)  Let me see if there was anything else I

20   really needed to talk about.

21       When the controlled purchase took place, you've told us

22   that it took place in Cuba, and you said that there was a

23   period of time that the CI drove from someplace to Cuba where

24   this thing took place.  Where did he drive from?

25   A.  Well, it was a little dirt pull-off road, you know, little

1    road before you get to Cuba.

2    Q.   So you --

3    A.   Off of Highway 550.  We took a little side road, drove down

4    there, and took care of it right there.

5    Q.   You staged with the CI before the controlled purchase not

6    far away from Cuba, then?

7    A.   Yes, it wasn't relatively too far.

8    Q.   And what contact did you have with him during the time that

9    you moved from your staging area to the place at which the

10   controlled purchase took place?

11   A.   I mean, we had eyes on him all the way through and into the

12   gas station.  Other agents were set up on the perimeter and

13   monitoring that.

14   Q.   I counted 10 agents including you.  Is that a fair

15   assessment, do you think?

16   A.   That's a fair assessment from our task force, yes, sir.

17   That's not including the other agents, you know, that were also

18   there.

19   Q.   From what agencies?

20   A.   Homeland Security, sir.

21        MR. ROBERT:  I think that's all the questions I have.

22   Thank you, Your Honor.

23        THE COURT:  Do you have any redirect?

24        MR. CAIRNS:  I do have some questions.  Very brief,

25   Your Honor.

1                                **REDIRECT EXAMINATION**

2       **BY MR. CAIRNS:**

3       Q.   You were asked by Mr. Samore whether, when the CI showed up

4       for this transaction, if you tested him for drugs right there

5       to make sure that he wasn't on controlled substances.  Do you

6       have in fact equipment in your vehicle that you can use to do

7       that?

8       A.   No, sir.

9       Q.   And was there any -- did he give any obvious signs of being

10      intoxicated or under the influence of drugs?

11      A.   No, sir.

12      Q.   Okay.  Now, with regard -- you've been asked repeatedly

13      about the confidential informant and the information that he

14      provided to you.  Was there a single piece of information that

15      the confidential informant provided to you that you took for

16      granted, in other words, without trying to corroborate it?

17      A.   No, sir.  We tried to corroborate everything that he was

18      describing to us.

19      Q.   In your experience as a narcotics detective, are these

20      people who come to work for you sometimes -- do they often have

21      lengthy criminal record?

22      A.   Some of them do, sir, yes, sir.

23      Q.   Is that a necessary evil of narcotics work?

24      A.   Yes, sir, to try to identify a source of supply or a main

25      source of supply, and then trying to track that, to how it's

1   getting into our community, yes, sir.

2           MR. CAIRNS:  I think that's all the questions I have,

3   Your Honor.

4           THE COURT:  All right.  May this agent be excused?

5           MR. CAIRNS:  Yes, Your Honor, subject to potential

6   recall, although I think that's not going to be necessary, but

7   yes.

8           THE COURT:  So you will have to wait outside.

9           Please call your next witness.

10           MR. SAMORE:  I want to make a record on this if I may,

11   Judge.

12           Pardon me, Mr. Cairns.

13           Judge, before this witness is excused, I would at least

14   ask to make a record for the court.  Here is my request.  We

15   are requesting that the court reconsider its ruling that we

16   cannot ask this witness questions about why this CI was

17   terminated from the program.

18           THE COURT:  And I will reconsider it and deny it at

19   this time, Counsel.

20           MR. SAMORE:  Thank you, Judge.

21           THE COURT:  All right.  He will still be available.

22   And we will address -- I understand that you withdrew your

23   motion.  Mr. Robert still has an outstanding motion, or parts

24   of a motion that are not ruled on, so we will address that at

25   the conclusion of this evidentiary hearing.

1          MR. CAIRNS:  Government calls Homeland Security Senior

2     Agent Chris Martin.

3          Your Honor, I'm going to try to move this along.  That

4     was our longest witness that we had.

5          THE COURT:  Would you please raise your right hand.

6                         **CHRIS MARTIN,**

7     after having been duly sworn, testified as follows:

8          THE COURT:  Please state your name for the record.

9          THE WITNESS:  My name is Chris Martin.  I'm a special

10    agent with Homeland Security Investigations.

11                    **DIRECT EXAMINATION**

12    **BY MR. CAIRNS:**

13    Q.  That answers my first question.  How long have you been

14    with HSI?

15    A.  Since 2008, sir.

16    Q.  Before that, were you a law enforcement officer with

17    another entity?

18    A.  Yes, sir, I was.

19    Q.  What is that?

20    A.  I was a Customs and Border Protection Officer for the

21    Department of Homeland Security since 2001.

22    Q.  Before that, were you a law enforcement officer?

23    A.  Yes, sir, I was.  I was with the El Paso Police Department

24    since 1996.

25    Q.  All right.  What currently are your duties with HSI?  I

1    guess what I mean by that is, do you work a specific kind of

2    case?

3    A.   Yes, sir, I'm currently assigned to the Border Enforcement

4    Security Task Force here in Albuquerque, which is task force

5    comprised of state and local entities, as well as special

6    agents with Homeland Security Investigations, and right now, we

7    are working narcotics investigations.  The majority of our

8    investigations are narcotics investigations.

9    Q.   In your career as a law enforcement officer, have you had

10   opportunity to do narcotics investigations?

11   A.   Yes, sir, I have.

12   Q.   In this case, did you participate in any surveillance of

13   Mr. Connors or any surveillance of his home or of his vehicle?

14   A.   Yes, sir, I did.

15   Q.   Can you tell me -- first of all, how did you get involved

16   in the case?

17   A.   We were involved -- we were assisting Special Agent Kepf

18   Region II Narcotics Task Force up in Farmington.  They had

19   identified a person who was residing in the Albuquerque area.

20   They provided us some information, and the date was the 17th, I

21   believe.  We assisted Agent Kepf at the Sunport car rental

22   agencies trying to identify subject known as TC, later

23   identified as Terrence Connors.

24   Q.   Did you also participate in a surveillance that was

25   connected or associated with a controlled buy of narcotics?

1   A.   Yes, sir, we did.

2   Q.   Tell me about that.

3   A.   I don't recall the date, but I know it was a couple of days

4   before the 17th, that we were -- I'm sorry --

5   Q.   Go ahead.

6   A.   We were notified that the subject known as TC was going to

7   be departing the Albuquerque area, and that he was going to be

8   heading to Cuba.  And we proceeded to follow a vehicle that we

9   had identified earlier that day as belonging possibly to

10  Terrence Connors.

11  Q.   All right.  What kind of vehicle was it?  Do you remember?

12  A.   No, sir, I don't.  Not without looking at the report.

13  Q.   Well, where did it go?  Where did that vehicle go?

14  A.   The vehicle -- we were following surveillance on that

15  vehicle that evening, and we followed it up to Cuba where

16  Region II Narcotics agents were already on scene.  And once we

17  notified them that the vehicle was in the area, they asked us

18  to go ahead and back off, and we stayed in the periphery area

19  while they conducted their surveillance and the operation.

20  Q.   What happened with that operation at the conclusion?

21  A.   When that operation concluded, we ended up following the

22  vehicle back to the Albuquerque area, and we relayed the

23  information that the operation was a success, and that the

24  vehicle that we had followed up was going to be returning to

25  Albuquerque.  And at that point, we followed it back.

1  Q.  Where did it arrive in Albuquerque?  Did it arrive at a

2  specific home or location?

3  A.  Yes, sir, I believe it was 1514 Gold Avenue in northeast

4  Albuquerque, I believe.

5  Q.  Is that where Terrence Connors lives?

6  A.  Yes, sir.

7  Q.  Did you in fact subsequently participate in a search of

8  that residence?

9  A.  On the 18th of December, yes.

10  Q.  So my question is, is that how you know that that's where

11  Terrence Connors lives?

12  A.  Yes, subsequent to the operation conducted on the 17th,

13  sir, we identified that location as a positive location for his

14  residence.

15  Q.  And did you also participate in the traffic stop that

16  occurred in this case?

17  A.  Yes, sir, we were the primary contact on the traffic stop.

18  Q.  Can you tell me what happened during the traffic stop.

19  A.  Yes, sir, myself and Enforcement Security Task Force

20  Officer Peter Fabian, who is a CDP, he was the driver that

21  evening, we were in a marked patrol unit, U.S. Customs and

22  Border Protection marked unit which has lights and sirens on it

23  and police markings on it.  We were advised that Terrence

24  Connors had rented a vehicle early that morning and had

25  possibly gone to Phoenix, and we were waiting for him to return

1    from the Phoenix area back into the New Mexico area.  Region II

2    agents were able to identify the subject driving back in the

3    vehicle, and at that point, they instructed us to go ahead and

4    conduct the traffic stop.

5    Q.   Did they relay to you the information as to what kind of

6    vehicle that was?

7    A.   Yes, sir.

8    Q.   Did you also know what kind of vehicle it was based on your

9    own investigation?

10   A.   Yes, sir.

11   Q.   And what investigation was that?

12   A.   Early that morning, as I stated before, we had gone to the

13   Sunport car rental agencies with a picture, and one of the

14   agents was able to identify Terrence Connors as a renter of a

15   vehicle from their agency, rental car agency, and that's the

16   vehicle we provided Region II a description of, and they were

17   able to positively view the vehicle, and also saw Mr. Connors

18   as a passenger in that vehicle, and relayed that information to

19   us when we were down in the Gallup area waiting for the car to

20   approach.

21   Q.   So tell me what happened during the traffic stop itself.

22   A.   Yes, sir.  So Officer Fabian went ahead and pulled the

23   vehicle over.  We already knew that there was a warrant that

24   was being held by the Region II agents, so we went ahead and

25   stopped the vehicle at that point.  We identified the driver.

1   We went ahead and conducted what we call a felony stop.  We got

2   out of the vehicle.  Peter Fabian instructed the driver to go

3   ahead and exit the vehicle.

4   Q.  Let me back up for just a moment.  When you say "felony

5   stop," were you aware as to whether or not there was a felony

6   arrest warrant out for Mr. Connors?

7   A.  Yes, sir, we were.

8   Q.  And was there in fact such a warrant?

9   A.  Yes, sir, there was.

10  Q.  So describe for me the felony arrest stop and how that

11  works.

12  A.  Yes, sir.  So we proceeded to stop the vehicle

13  approximately -- I think it was I-40 eastbound from the Gallup

14  area, around mile post 22, I believe.  So once we had the

15  vehicle stopped, he pulled directly over to the right.

16  Mr. Fabian went ahead and over the PA instructed him to go

17  ahead and turn the vehicle off, put their hands where we could

18  see them.

19      And the driver was reaching underneath the seat as we

20  conducted -- while he was being given instructions.  We later

21  identified the driver as TC -- I'm sorry, not TC.  That was

22  Jones, Mr. Jones.  And we observed him reach underneath the

23  seat.  We didn't know what the movement was for, whether he was

24  trying to hide something or put something in his hand.  At that

25  point, he was instructed to step out of the vehicle with his

1   back facing us.  Mr. Fabian then instructed him to walk

2   backwards back to us into a position where we could get -- take

3   him into custody, and he was handcuffed and patted down for

4   weapons.

5   Q.  At this point in time, were weapons drawn by the officers

6   that conducted the stop?

7   A.  Yes, sir.

8   Q.  Did you also ask Mr. Connors to leave the vehicle?

9   A.  Yes, sir.  After we got Mr. Jones into custody, we

10  conducted an initial pat-down for firearms, and once he was in

11  custody, he was moved over to the side by one of the other

12  agents or officers, and then, at that time, we began to

13  instruct Mr. Connors to exit the vehicle in the same manner.

14  Q.  Did he do so?

15  A.  Yes, sir, he did.

16  Q.  After Mr. Connors had exited the vehicle, did you further

17  make an attempt to assure yourselves that the vehicle didn't

18  contain any other items?

19  A.  Yes.

20  Q.  Did it contain any other occupants?

21  A.  No, sir.

22  Q.  At that point in time, were the weapons put away?

23  A.  Yes, sir.

24  Q.  Now, on your inspection of the vehicle itself, did you or

25  any of the other agents observe from the outside of the vehicle

1   any contraband?

2   A.   Yes, sir, we observed a pipe, a glass pipe, that was stuck

3   in between the seat and the door frame in the vehicle on the

4   driver's side where we believe Mr. Jones was trying to

5   manipulate that area during the traffic stop, the initial phase

6   of the traffic stop.  It was photographed, and through my

7   training and experience, I know that glass pipe to be a meth

8   pipe.  There was also a white residue at the bottom of the pipe

9   as well.

10  Q.   I would like to hand you what's been marked as Government's

11  Exhibit 1.  Can you tell me what that's a photo of?

12  A.   That's the photo of the glass pipe that was found by

13  Officer Fabian.

14  Q.   Is that what it looked like that day?

15  A.   Yes.

16          MR. CAIRNS:  Move for admission of Government's Exhibit

17  number 1.

18          THE COURT:  Any objection, Counsel?

19          MR. ROBERT:  No, Your Honor.

20          MR. SAMORE:  None, Judge.

21          THE COURT:  Government's 1 will be admitted.

22      (Government's Exhibit 1 admitted.)

23  Q.   (By Mr. Cairns)  So that's the methamphetamine pipe that

24  you observed from outside the vehicle?

25  A.   That's correct.

1  Q.  And that was prior to the search of the vehicle?

2  A.  That's correct.

3  Q.  Was a dog also deployed on the vehicle?

4  A.  Yes, sir.  There was a K-9 officer that was called to the

5  scene, and he deployed his K-9 dog, drug detection dog, to the

6  vehicle.

7  Q.  And what was the result of that?

8  A.  There was a positive response according to the K-9 officer.

9  There was a positive response to the driver's side where

10  Mr. Jones had been seated, and the K-9 also alerted or showed

11  an indication, positive response, to the back seat where there

12  was luggage located.

13  Q.  So did you subsequently search the vehicle?

14  A.  Yes, we did.

15  Q.  What did you find?

16  A.  We ended up finding -- of course, at that point, we

17  retrieved the pipe.  We also went back and looked into the

18  luggage where the dog had alerted.  As I opened up a bag in the

19  back seat, there was a pair of tennis shoes contained within an

20  interior bag.  In the tennis shoes, there was a bundle.  Inside

21  of the socks was two taped bundles which in my training and

22  experience I knew to be narcotics or the way that narcotics are

23  held.

24  Q.  Packaged?

25  A.  Packaged, right, correct.

1   Q.   Was there -- did somebody field test that system?

2   A.   Yes, sir, we did.

3   Q.   What was the result?

4   A.   It was positive for methamphetamine.

5   Q.   Did you also find a firearm inside the vehicle?

6   A.   Yes, sir, in the same bag contained within a gun container,

7   gun case, we also found a Glock 17 nine millimeter.

8   Q.   Was the weapon loaded?

9   A.   It was, sir.

10   Q.   Did you subsequently participate in a search of

11   Mr. Connors -- I think I asked you that question, already, I'm

12   sorry.  Did you participate in a search of Mr. Connors'

13   residence?

14   A.   Yes, sir.  When we got him back to Albuquerque, Mr. Connors

15   provided us consent to search his home.

16   Q.   When did he provide that consent?  What were you doing when

17   he decided to consent?

18   A.   We were back at the Albuquerque office processing the

19   evidence that we had retrieved from Gallup, and they were

20   continuing the process of criminal processing for him at the

21   office.

22   Q.   And were you preparing a search warrant at that time?

23   A.   Yes, sir, I was writing up a search warrant at that time.

24   Q.   I would like to approach, and I'm handing you what's

25   Government's Exhibit Number 3.  Can you tell me what that is?

1  A.  Yes, sir, that's a consent to search Mr. Connors'

2  residence, and I misstated earlier.  It was 1517-1/2 Gold

3  Avenue, Southeast, Albuquerque.

4  Q.  Did you prepare this form yourself?

5  A.  Yes, sir, I did.

6  Q.  Is that your signature at the bottom?

7  A.  It is.

8          MR. CAIRNS:  I would move for the admission of

9  Government's Exhibit Number 3.

10          THE COURT:  Any objection, Counsel?

11          MR. SAMORE:  I think it is an unredacted document, so I

12  would like to look at it.  No objection, Judge.

13          MR. ROBERT:  No objection.

14          THE COURT:  Government's 3 will be admitted.

15      (Government's Exhibit 3 admitted.)

16  Q.  (By Mr. Cairns)  Does this document also bear the signature

17  of Terrence Connors?

18  A.  That's correct, sir.

19  Q.  Did he sign this in your presence?

20  A.  Yes, sir, he did.

21  Q.  This is after you discussed it with him?

22  A.  Correct.

23  Q.  And did he express any reservations about consenting to a

24  search of his residence?

25  A.  No, sir.  Up to that point, he had been totally cooperative

1    with us.  He was still a little bit nervous with the encounter

2    of police, but he was coherent and participated voluntarily.

3    Q.  Based on this consent form, did you subsequently also

4    finish up and execute that search warrant?

5    A.  We did complete the search warrant, but after speaking to

6    the United States Attorney's Office, because we had been

7    granted consent, they requested that we just go ahead and

8    conduct the search on the consent.

9    Q.  What did you find inside the residence?

10   A.  We went -- when we arrived at the house later on that

11   morning, we found several firearms located within a safe in the

12   bedroom closet, and then we found additional narcotics and

13   currency.

14   Q.  All right.  Now, let me ask you this, because this is in

15   one of the motions.  Did Mr. Connors express concern over his

16   dog?

17   A.  He did, sir.

18   Q.  What did he say to you?

19   A.  He told us that he had a dog named Gateway at the home that

20   was by itself, and he expressed concern for its safety and

21   well-being.

22   Q.  Did you try to help Mr. Connors with regard to the dog?

23   A.  Yes, sir, we did.  I think that the agents allowed him to

24   make a phone call to a family member to later on pick up the

25   dog after we had finished with the search.  We also took

1   Mr. Connors to the residence with us, at which time we allowed

2   him to take possession of the dog while we conducted our

3   search.

4   Q.  In fact, did you remove his handcuffs?

5   A.  Upon arrival, after we secured the residence, made sure

6   there was no other people in the residence that would cause any

7   harm or issues, we allowed him to be unhandcuffed, and he sat

8   on the couch with Gateway as we conducted the search.

9   Q.  I would like to, with the court's permission, approach and

10  hand you what's been marked as Government's Exhibit Number 6.

11  Can you tell me what that is?

12  A.  Yes, sir, that's a picture of Mr. Connors holding Gateway.

13  Q.  Okay.  Is that what it looked like when you were there?

14  A.  Yes, sir.

15          MR. CAIRNS:  I move for admission of Government's

16  Exhibit Number 6.

17          THE COURT:  Any objection, Counsel?

18          MR. ROBERT:  No objection.

19          MR. SAMORE:  I want to take a look at it before I waive

20  objection.

21          MR. CAIRNS:  I did provide copies of all of my exhibits

22  to counsel, but in fairness, the copies of this are very hard

23  to see.

24          THE COURT:  Any objection, Counsel?

25          MR. SAMORE:  None, Judge.

1          THE COURT:  Government's Exhibit 6 will be admitted.

2    Thank you.

3       (Government's Exhibit 6 admitted.)

4          MR. CAIRNS:  I think that's all the questions I have at

5    this time of this witness.

6          THE COURT:  Thank you.  Cross examination.  Mr. Robert,

7    do you want to go first?

8                       **CROSS EXAMINATION**

9    **BY MR. ROBERT:**

10   Q.  Agent, the dog, K-9 that you testified alerted to the

11   vehicle, do you know if Mr. Jones or Mr. Connors were present

12   at the time at which the dog was run on the car?

13   A.  That, I can't recall, sir, directly.  The dog was called in

14   immediately after we had searched the vehicle for bodies,

15   additional people in the vehicle, to include the trunk; but I

16   can't recall exactly the time frame, if both defendants were

17   still at the scene or not.

18   Q.  Was there any kind of a -- I'm sorry, go ahead.

19   A.  I don't think they were held at the scene very long.  It

20   was a cold December night.

21   Q.  Was there any time line between the time that the call was

22   made to the K-9 officer and the time of his arrival at the

23   scene?

24   A.  It was a couple of minutes, sir.  He was already staged

25   waiting for us as well.

1  Q.  But you can't say for sure whether Mr. Jones was there when

2  this happened?

3  A.  No, sir.  I'm trying to recall.  I don't remember if they

4  were still on the scene.

5  Q.  Did you observe this process by which Agent Ronk ran the

6  dog on the car, or Officer Ronk?

7  A.  I don't remember if it was Officer Ronk or not, but, yes,

8  sir, we were there still on the scene, myself and Mr. Fabian.

9  Q.  You saw the dog?

10  A.  We did see the dog.

11  Q.  You saw the alert?

12  A.  I'm not a trained K-9 officer, so I don't know what

13  indicates an alert for them.  They work exclusively with the

14  dog and go through specific training, so I wouldn't be able to

15  tell you, sir.

16  Q.  Were you present at the time at which the K-9 officer

17  indicated that there was an alert?

18  A.  Yes, sir, and he was the one that told us the alert before

19  we searched.

20          MR. ROBERT:  That's all, thank you.

21          THE COURT:  Mr. Samore?

22                    **CROSS EXAMINATION**

23  **BY MR. SAMORE:**

24  Q.  Mr. Martin, as you understand it, your primary role, at

25  least in this hearing, is to tell us about the search of

1    1517-1/2 Gold.

2    A.   That's correct, sir.

3    Q.   All right.  You did not interview my client in Gallup.

4    A.   No, sir.

5    Q.   All right.  You did not follow the vehicle all the way to

6    Phoenix and all the way back.

7    A.   No, sir.

8    Q.   Now, your height and weight is approximately what?

9    A.   I am six-four, approximately 215 pounds.

10   Q.   That's approximately what it was the date you first met

11   Terry Connors?

12   A.   Yes, sir.

13   Q.   And you would agree Mr. Connors is significantly smaller.

14   A.   Yes, sir.

15   Q.   Didn't you and Terry Connors have a chat in an office in

16   Albuquerque before you went to his residence?

17   A.   We did, sir.

18   Q.   All right.  Was that conference recorded?

19   A.   No, sir.

20   Q.   Why was that conference not recorded?

21   A.   In our office, we are not -- by policy, we don't have to

22   record any interviews, anything like that.  It's incumbent upon

23   the case agent whether they are going to record.

24   Q.   Okay.  That's not based on financial concerns or the cost

25   of running tape recording.  It is just a decision the

1    individual agent can make?

2    A.  No, sir, it is just not in our policy.  It doesn't say

3    anywhere that we have to record.

4    Q.  But I think we're not quite understanding the question.  It

5    is not based on financial concerns or the cost of a recorder.

6    It is left up to the individual agent as to whether he or she

7    wishes to record?

8    A.  I don't think that's a correct representation, sir.  It is

9    not put in policy that it has to be done or it doesn't have to

10   be done.  There is no policy that states that it has to be

11   recorded or not recorded.

12   Q.  Have you ever recorded interrogations?

13   A.  I have one or two.

14   Q.  All right.

15   A.  We merely do interviews of our defendants at the time.  So

16   as you can see from my stature, I'm not going to state that it

17   is interrogation because that would be a show of force.  I

18   don't do that.  I normally, if I'm going to ask something, I

19   talk to them in a calm and respectful manner because it is

20   easier to gather information from them.

21   Q.  Of course, that's the way you've been trained because a

22   calm, respectful manner is usually a good way to get people to

23   talk.

24   A.  Yes, sir.

25   Q.  You get better information?

1    A.   I've found over the course of many years, yes, sir.

2    Q.   It doesn't change that you're a big, imposing guy.   The

3    point is you don't need that when you ask polite questions and

4    you're considerate of an individual?

5    A.   It depends on the defendant.   Some of them, of course, in

6    the type of work we do, we deal with street dealers, narcotics

7    dealers, who grow up in a gang environment who have no respect

8    for the law, so it just depends on the type of person that

9    you're interviewing at that time.

10   Q.   That wouldn't apply in your chat with Mr. Connors?

11   A.   No, Mr. Connors was respectful throughout my encounter with

12   him.

13   Q.   How long did your conversation last with him in Albuquerque

14   before you went to his residence?

15   A.   I would say it was probably over an hour, maybe, maybe 30

16   minutes, maybe an hour.   I don't recall specific time frame.

17   But we did have a lengthy conversation.

18   Q.   Did he make any admissions to you or statements about being

19   involved in distribution or possession of illegal drugs in that

20   time?

21   A.   I don't recall any specific statements that he made.   I

22   didn't -- like I said, I wasn't interviewing him at that point.

23   We were gathering information to see who was at the house, if

24   there was any further bodies at the house, what type of

25   evidence we would be collecting at the house, was my main

1    concern.

2    Q.   Did you ride with him from Gallup to Albuquerque?

3    A.   No, sir.  He was transported by another agent.  I drove the

4    rental vehicle back from Gallup.

5    Q.   Now, I guess I'm concerned about another question is when

6    those handcuffs were taken off.  Weren't those handcuffs taken

7    off before he returned to Albuquerque?

8    A.   That, I wouldn't know, sir.  I don't believe so.  When we

9    transport prisoners -- in this case, I believe that he was put

10   into a caged vehicle and then transported back to Albuquerque.

11   Q.   What is a caged vehicle?

12   A.   A caged vehicle is normally a police vehicle with a cage in

13   between the driver and the passenger area, the back passenger

14   area.  So that way, it ensures the safety of the officer

15   driving the subjects to the location.

16   Q.   Would it also be practice and policy that Mr. Connors and

17   Mr. Jones were transported in separate vehicles?

18   A.   There is a possibility, sir.  I wasn't part of the

19   transport of the prisoners, so I wouldn't be able to tell you

20   what happened that day.

21   Q.   So you first met him -- pardon me, did you first meet him

22   face to face in Albuquerque?

23   A.   No, sir, the first meeting was in Gallup.  I was actually

24   the agent who conducted the pat-down search of them after we

25   had them exit the vehicle.

1  Q.  In the field?

2  A.  Right.

3  Q.  Okay.  And from the time -- best estimate, because -- from

4  the time the vehicle was stopped until you arrived on scene was

5  approximately how long?

6  A.  I'm sorry, I don't understand --

7  Q.  It was just a few seconds, wasn't it?  They stopped for

8  your vehicle.  Isn't that correct?

9  A.  That's correct.  I was the passenger in the marked police

10 unit that conducted the traffic stop.

11 Q.  And this felony stop was executed without having to go to

12 the car yourselves with guns drawn, but you had them get out

13 because you were using the intercom or whatever they call it.

14 A.  We were using the PA system on the vehicle, yes.

15 Q.  PA system.  All right.  Now, how long approximately was it

16 from the time of the stop until Mr. Connors and Mr. Jones were

17 taken away from the scene to Gallup?

18 A.  It wasn't very long, probably over the course of maybe five

19 minutes.

20 Q.  I'm going back -- I hope I'm not going to revisit more than

21 one question of Mr. Robert's or my colleague, Mr. Cairns.  Was

22 the dog car on scene prior to our clients being removed from

23 the scene?

24 A.  I don't recall, sir.

25 Q.  Is it possible that dog car didn't even arrive with

1    Mr. Ronk until after they left the scene?

2    A.   It's possible.

3    Q.   Now, I'm going to turn to when you were discussing with my

4    client, chatting with my client, in Albuquerque.  Is that the

5    first time you had been informed that he had concerns for his

6    dog at his apartment?

7    A.   Yes.

8    Q.   Didn't he say to you -- or pardon me, didn't you say to him

9    words -- pardon me, let me strike that and start the whole

10   question again.  Normally, unless there was some extenuating

11   circumstances, you wouldn't just take a suspect to their home

12   to take care of their dog.

13   A.   Correct, sir.

14   Q.   In this case, you were wondering if there was drugs at the

15   residence.  Weren't you?

16   A.   He had informed us that he may still have some at the

17   house.

18   Q.   And you were aware before he signed this consent, or at

19   least he stated that he had some drugs at the house, weren't

20   you?

21   A.   Correct.

22   Q.   Didn't he say to you words to this effect -- pardon me,

23   didn't you say to him words to this effect, that "if you sign

24   the consent, we can take you there," or "we can take you to

25   take care of your dog"?

1    A.  I don't recall that statement being made, sir.

2    Q.  When you say you don't recall, you might have said

3    something to that effect, and you might not have said it.  Is

4    that correct?

5    A.  That's correct.

6    Q.  And after this statement was made, that's when he signed

7    this authorization?

8    A.  I don't remember making that statement, sir.  Basically, if

9    I was going to ask for consent on this, I would advise him that

10   it's voluntary.  We already had a search warrant being drafted.

11   We would rather get consent, and I probably made a statement as

12   to if he still had keys on him, that would probably be a lot

13   easier than us breaking down the door, and he did advise us of

14   the concern towards his dog.  And so my line of thinking, I

15   believe, at that time was that it would be easier for us,

16   instead of having to knock the door down, is to have him

17   consent and allow us entry into the house.

18   Q.  He told you there was no one else living in that apartment,

19   didn't he?

20   A.  He did, as I recall, but we don't always take the

21   defendant's word at that, so we have to ensure the safety of

22   our officers.

23   Q.  Mr. Connors had been very agreeable throughout your

24   interviews, hadn't he?

25   A.  In my encounter with him, yes, sir.

1   Q.   And after this consent was signed, that's when he was taken

2   to the residence.

3   A.   Correct.

4   Q.   All right.   Were you aware -- when were you first aware of

5   his criminal record or lack of any criminal record?

6   A.   We were advised prior to the operation starting, we had a

7   briefing, and they advised -- they showed us pictures of the

8   suspect, Mr. Connors, at that time.

9   Q.   Where did that briefing occur?

10  A.   I believe it was done in Albuquerque.   Prior to us

11  departing.

12  Q.   Who was present at that briefing?

13  A.   I could not tell you offhand, sir.   I know that Agent Kepf

14  was the case agent on the scene, and I know she was the one

15  that provided the briefing information to us.

16  Q.   Is it a pretty standard procedure, that before an operation

17  like this begins, the officers involved are informed regarding

18  the records?

19  A.   That's correct.

20  Q.   And that's a big factor in officer safety, isn't it?

21  A.   Yes, sir.

22  Q.   Someone that has a criminal record with some violence,

23  you're going to be extra zealous to protect your safety, aren't

24  you?

25  A.   That's correct, sir.

1  Q.   In this case, you didn't have that concern regarding these

2  gentlemen?

3  A.   That's not correct, sir.  We had information that

4  Mr. Connors possibly carried a firearm with him during his

5  transport of narcotics, and possibly had it during deals that

6  he had conducted previously.

7  Q.   Okay.  Other than that, that's the only information you

8  have regarding -- that would arouse officer concern?

9  A.   Yes, sir, that was enough for us to go into a felony stop

10  as opposed to an approach-type stop where it is a traffic stop

11  for a minor violation.

12  Q.   Is there any incriminating statements -- pardon me, yeah,

13  any incrementing statements other than that which you have

14  described today that my client made to you during the time that

15  you were interacting?

16  A.   No, he had been previously mirandized, and my talking to

17  him was specific to evidence type of collection that we would

18  be anticipating upon completion of the search of his residence.

19  Q.   Did you prepare any written report on your work on this

20  case?

21  A.   Yes, sir, I did.

22  Q.   Have you submitted that to the government?

23  A.   It was provided to the case agent at that time who I

24  believe forwarded that to the appropriate attorneys.

25        MR. SAMORE:  Thank you, sir.  No further questions.

**REDIRECT EXAMINATION**

1

2 **BY MR. CAIRNS:**

3 Q.  You were asked about sometimes recording statements or

4 interviews that are made by defendants and sometimes not.

5 Again, in your experience as a narcotics detective, if you

6 don't record, does that sometimes help facilitate the

7 statement?

8 A.  Yes, sir.  We normally will take notes or whatever as far

9 as our interview process is concerned, and those are assistive

10 in writing our reports later.

11 Q.  I guess my point is, does the presence of a recording

12 device influence that individual's decision to make a statement

13 or not?

14          MR. SAMORE:  Objection, leading and suggestive of a

15 response.

16          MR. CAIRNS:  I don't think it is leading.  It

17 doesn't -- in other words, it could be a yes or no --

18          THE COURT:  Overruled.

19 Q.  (By Mr. Cairns)  You can answer the question.

20 A.  Sometimes if the subjects know it is being recorded, they

21 do hesitate to even respond, or sometimes they won't do it

22 until we don't record.

23          MR. CAIRNS:  That's all I have.

24          THE COURT:  May this witness be permanently excused?

25          MR. CAIRNS:  Yes, Your Honor.  Yes, unless defense has

1    an objection.

2              MR. ROBERT:  No objection.

3              MR. SAMORE:  None, Judge.

4              THE COURT:  Thank you.

5              All right.  Counsel, I would propose that we continue.

6    It's getting close to the lunch hour.

7              Let me ask Mr. De La Rosa if he has any concerns with

8    that, if he's available.

9              MR. CAIRNS:  We can probably push through.  We have

10   just three more witnesses, two of them will be very short,

11   although one of them had to run an errand, so I want to make

12   sure she's available.

13             If you can check on her status.

14             Then we have -- I think these witnesses are going to go

15   very quickly.

16             THE COURT:  Then we'll go ahead and continue, then.

17   Call your next witness.

18             MR. CAIRNS:  If I could have just a minute for Ms. Kepf

19   to check on the status of one of the witnesses, and then we'll

20   move on.

21             United States calls Abbey Kepf.

22             THE COURT:  Would you please raise your right hand.

23                          **ABBEY KEPF,**

24   after having been duly sworn, testified as follows:

25

1                         DIRECT EXAMINATION

2   BY MR. CAIRNS:

3   Q.   Can you please state your name for the record.

4   A.   Yes, it's Abbey, A-B-B-E-Y, Kepf, K-E-P-F.

5   Q.   Where are you currently employed?

6   A.   With Homeland Security Investigations.

7   Q.   How long have you been with HSI?

8   A.   Approximately three years.

9   Q.   Are you also a member of this task force that we've

10  discussed here today?

11  A.   That's correct.  As a special agent, I'm assigned to the

12  Border Enforcement Security Task Force.  Part of my

13  responsibilities, or the majority of my responsibilities, is an

14  assignment to Region II Narcotics Task Force which is located

15  in or near Farmington, New Mexico.

16  Q.   Are you the case agent who is assigned to this case?

17  A.   Yes, sir.

18  Q.   How did you first get involved in the investigation?

19  A.   Basically, the way the relationship is between Homeland

20  Security and Region II, they will contact me with various

21  information involving narcotics, mostly methamphetamine, in the

22  Four Corners region.  We'll openly discuss information that

23  CI's are providing to them, information following arrests in

24  San Juan County.

25       During this investigation, information was brought to my

1   attention that Region II had secured a confidential source that

2   indicated they could facilitate a controlled purchase for a

3   large source of supply or a source of supply that was located

4   in or near Albuquerque.  So we just went forward with that

5   information.

6   Q.  Did you assist them and work with them in continuing the

7   investigation?

8   A.  Yes, sir.

9   Q.  So we'll go -- we won't go through that all over again.

10  You've been in the courtroom during the other examinations.

11  Were you aware of these other steps that were being taken by

12  Detective Verhulst and other agents?

13  A.  Yes, sir.

14  Q.  Now, are you aware, was there or was there not a warrant

15  issued by state judge for a tracking device?

16  A.  Yes, sir.

17  Q.  First of all, after the warrant was issued, what did you do

18  in response to that?  Did you help in obtaining and installing

19  the tracking devices on Mr. Connors' vehicle, or did you

20  oversee that process?

21  A.  Through surveillance and actually several days of working

22  intelligence and trying to identify who TC was, vehicles that

23  were being utilized to potentially smuggle or traffic items, we

24  obtained a tracking warrant for that vehicle.  We utilized a

25  trafficking device, as I instructed both Region II agents and

1    other HSI agents, whoever was available at the time or who had

2    access to the vehicle, to go ahead and place a tracker on the

3    vehicle.

4    Q.   Did they do so?

5    A.   Yes, sir.

6    Q.   What information did you receive from the tracking device,

7    you or other agents?

8    A.   Well, we were initially expecting to obtain information

9    that the vehicle was going to be headed towards -- westbound

10   towards Phoenix.  We actually received information otherwise,

11   that indicated that the vehicle was traveling to Sunport

12   airport.  The vehicle traveled to Sunport, was there for a

13   period of time, and then returned back to the residence later

14   identified as belonging to Terrence Connors.

15   Q.   And so based on that information, did you conduct an

16   investigation at the airport?

17   A.   Yes, sir.

18   Q.   What was that investigation?

19   A.   We had a photo that had been identified through a photo

20   lineup utilizing the Region II CI that had had a positive ID on

21   who TC was, which was identified as Terrence Connors.  I

22   printed that photo, and we walked from rental entity to rental

23   entity at Sunport and just said, "Have you seen this

24   individual?  Do you know who this individual is?"

25        We ultimately -- of course, the very last rental place we

1    go to is Thrifty Rental, and they say, "Yes, we're aware of

2    this individual.  His name is Terrence Connors.  He rents a

3    vehicle from us frequently, averaging about every two weeks."

4    They pulled rental history showing he had rented the vehicle

5    with another individual, Mr. Jones, and that Mr. Jones was

6    listed as a secondary driver on the rental vehicle.

7    Q.  Okay.  So is the vehicle that had the tracking device on,

8    is that vehicle out in the parking lot someplace?

9    A.  No, it's not.

10   Q.  When he rents the other vehicle, what does he do with his

11   own vehicle?

12   A.  I suspect that somebody went with him -- the information

13   that was provided to me led me to believe because Mr. Jones was

14   listed as a secondary driver on the vehicle that Mr. Jones

15   traveled with Mr. Connors to Sunport, and then upon leaving

16   Sunport, securing the rental vehicle, one of them drove the

17   rental vehicle, and one of them drove Mr. Connors' vehicle, the

18   vehicle with the tracking device, back to Mr. Connors'

19   residence.

20   Q.  Okay.  On the rental vehicle itself, you don't have -- was

21   there a tracking device installed on that vehicle?

22   A.  No, sir.

23   Q.  But did you have another way to know in very general where

24   Mr. Connors was at any given time?

25   A.  Yes.  That was through a GPS tracking device that was on

1  his cell phone.  We call it a ping location.

2  Q.  Was that also issued by a state district judge?

3  A.  Yes, sir.

4  Q.  So based on that information from these GPS pings, what

5  were you able to learn about Mr. Connors' -- did he take a trip

6  somewhere?

7  A.  Yes, sir, he traveled westbound from Albuquerque in or near

8  the Phoenix, Arizona area, and then he traveled back towards

9  the State of New Mexico where we encountered him in or near

10  Gallup, New Mexico.

11  Q.  Did you participate also in that traffic stop?

12  A.  Yes, sir.

13  Q.  And again, with regard to the testimony that you have

14  already heard, was the testimony that you have heard about what

15  happened during that traffic stop, was it accurate based on

16  your own memory?

17  A.  I'm sorry, could you rephrase that?

18  Q.  Yes, ma'am, I'm sorry.  Based on the testimony that you

19  have heard in this courtroom from other agents and officers, is

20  how they described that traffic stop accurate based on your own

21  memory?

22  A.  Yes, sir.

23  Q.  Now, after the traffic stop, what did you do then?  What

24  was your role in the investigation after the stop and after

25  Jones and Connors had been taken into custody?

1    A.   Well, I assisted in at least initially on -- basically, the

2    way that it was outlined, I think there was some confusion as

3    to how this all transpired.  But basically, we had Region II

4    agents and had Homeland Security agents.  We had approximately

5    five or six Homeland Security agents, and Region II's task

6    force is approximately 10 agents.  We were able to communicate

7    through cell phone and radio communication.  Region II agents

8    were set up in vehicles every few miles along the I-40 stretch

9    between the Arizona border and the New Mexico border there,

10   trying to get eyes on the vehicle that had been described to us

11   from Thrifty Rental Car as the vehicle being driven or rented

12   by Mr. Connors and/or Mr. Jones.

13        That vehicle, because we did not have a tracking device on

14   that vehicle, we only had the GPS ping location, we didn't have

15   a whole lot of accuracy of where that vehicle would be, so we

16   had agents set up to keep an eye out for the vehicle.

17        Those agents then reported to me as well as to the

18   Region II commanding officers that they had identified the

19   vehicle that they believed to be driven by Connors and/or

20   Mr. Jones.  That vehicle, as it was traveling back from the

21   Phoenix area, traveled from Arizona to New Mexico, that vehicle

22   was stopped at about mile 22 marker in New Mexico near Gallup.

23        We had a marked unit because we were concerned for officer

24   safety, and it's a little different because Region II is

25   comprised of marked units and unmarked units.  Our units that

1   we were utilizing for the most part were unmarked units, so we

2   had a marked unit with a PA system for officer safety, because

3   oftentimes in narcotics, or at least lately in narcotics

4   transactions, there is a concern that if someone is traveling

5   with large quantities of expensive drugs that they may be

6   ripped off, and so we wanted to make sure that there was a

7   marked unit so that the drivers of the vehicle or those that

8   were in the vehicle knew that we were in fact police.

9       Agent Martin and Pete Fabian were in the marked unit.  Pete

10  Fabian was calling out commands to the driver, and then to the

11  passenger.  As the driver is walking back, weapons are drawn

12  until they are in a position where we do not have to point

13  weapons at them, and then they are placed into handcuffs.  As

14  they are being placed into handcuffs, they are sort of being

15  passed back towards a secure area where they are then patted

16  down for officer safety.

17      So my role was to sort of oversee this, participate and/or

18  oversee them, and then subsequently, when they are both secure,

19  then I facilitated their transportation.  I had an agent

20  transport Mr. Connors and an agent transport Mr. Jones to a

21  nearby station, police station, where we then can interview

22  them.

23  Q.  Where was that police station?

24  A.  It was around Gallup, in or near Gallup.

25  Q.  So did you participate in that interview?

1   A.   Yes, sir.

2   Q.   All right.   How many other agents were present at the

3   beginning of the interview with you?

4   A.   I interviewed Mr. Connors, and there was one other agent

5   that was initially present during the interview, Christine

6   Brital.

7   Q.   Did you read Mr. Connors his Miranda rights before you

8   conducted the interview?

9   A.   Yes, sir.

10  Q.   Did he acknowledge his understanding of those rights and

11  his willingness to talk?

12  A.   Yes, sir.

13  Q.   In fact, you have a copy of the Miranda warning.

14       MR. CAIRNS:   I'm handing the witness what is marked as

15  Government's Exhibit Number 2.

16  Q.   (By Mr. Cairns)   Can you tell me what that is?

17  A.   This is a copy of the Miranda cards that we read, we

18  usually keep these in our credentials.   It is a standard

19  warning we read to anybody prior to interviewing them.

20  Q.   Does this copy actually bear some signatures, and is yours

21  one of those signatures?

22  A.   Yes, sir.

23  Q.   Is this the copy -- is this the Miranda warning that you

24  provided to Mr. Connors?

25  A.   Yes.   My recollection is actually he was read his Miranda

1   rights twice.  I read him his rights, and then we went and

2   photocopied the card, read them and initialed.  I recall two

3   Miranda warnings.

4        MR. CAIRNS:  I move for the admission of Government's

5   Exhibit Number 2.

6        THE COURT:  Any objection, Counsel?

7        MR. SAMORE:  None, Judge.

8        MR. ROBERT:  No, Judge.

9        THE COURT:  Exhibit 2 will be admitted.  Thank you.

10   (Government's Exhibit 2 admitted.)

11   Q.  (By Mr. Cairns)  Did Mr. Connors actually sign this copy of

12   the Miranda warning acknowledging the fact that he had been

13   advised of those rights and was going to talk?

14   A.  Yes, sir.

15   Q.  Did you also sign?

16   A.  Yes, sir.

17   Q.  And did Christine Brital also sign?

18   A.  Yes, sir.

19   Q.  When does this indicate those signatures were placed on

20   this document?

21   A.  It is my handwriting, and it is dated 12/17/2012 at 11:34.

22   Q.  All right.  Did you subsequently take a statement from

23   Mr. Connors?

24   A.  Yes, sir.

25   Q.  Did he make admissions regarding the methamphetamine that

1    was found in the vehicle and the firearm?

2    A.  Yes, he did.

3           MR. CAIRNS:  That's all the questions I have of this

4    witness.

5           THE COURT:  Cross examination.

6                        **CROSS EXAMINATION**

7    **BY MR. SAMORE:**

8    Q.  Ms. Kepf, I'm going to begin by asking some questions about

9    your role in this case and about your background.

10   A.  Yes, sir.

11   Q.  Thank you.  Now, were you present in this case at the stop

12   in the field?

13          THE COURT:  Counsel, she's already answered those

14   questions.  I don't want you to ask her questions that she's

15   answered in the interest of time.

16   Q.  (By Mr. Samore)  Here is how I'll approach it, then.  You

17   were authorized to carry a weapon.

18   A.  Yes, sir.

19   Q.  Tell me in a summary version your prior law enforcement

20   experience.

21   A.  Prior to working with Homeland Security?

22   Q.  Yes.

23   A.  I also worked as a criminal investigator with the

24   department of -- United States Department of Labor Office of

25   Labor Management Standards.  I was employed there for

1    approximately six years.

2    Q.  Six years?

3    A.  Six years.

4         MR. SAMORE:  Judge, may I have permission to grab a

5    sheet off my desk?

6         THE COURT:  Sure.

7         MR. SAMORE:  Thank you.

8    Q.  (By Mr. Samore)  Now, have you throughout that time period,

9    the six years when you were a criminal investigator, and your

10   time with Homeland Security, studied and practiced various

11   interrogation or interview techniques?

12   A.  Yes, sir.

13   Q.  Have you ever gone to one of the FBI programs?

14   A.  No, sir.

15   Q.  Have you ever gone to one of the Reid programs?

16   A.  I believe Reid made a presentation within the Federal Law

17   Enforcement Training Center, but in terms of anything

18   independent of the required training at FLETC, no, I have not.

19   Q.  But within -- I mean, you recognize the term first of all,

20   the Reid Training Program, R-E-I-D?

21   A.  Yes, sir.

22   Q.  And that's pretty widely respected as an interview

23   technique, isn't it?

24   A.  Yes, sir.

25   Q.  You have incorporated into your techniques when you

1  interview with someone various aspects of your training that

2  you feel is effective.

3  A.  Yes, sir.

4  Q.  All right.  We can agree that it is -- you are trained, and

5  you would agree that an admission can be a pretty powerful bit

6  of evidence when you're investigating and trying to establish

7  criminal responsibility.

8  A.  Yes, sir.

9  Q.  Now, from the case that we have here today, I'm going to

10  ask you some questions about your interaction with my client,

11  Mr. Connors.  You didn't know him before this date.

12  A.  No, sir.

13  Q.  All right.  And when you interviewed him, do you remember

14  where you were at the Gallup station?

15  A.  We were in just a room, an unmarked room.

16  Q.  The door was closed?

17  A.  The door had been open and closed.  It was back and forth.

18  Q.  Where was Mr. Connors seated, if he was sitting?

19  A.  He was sitting at a table within the room.

20  Q.  And were you present with, I think, another officer in this

21  case?  You were present with -- was it Ms. Brital?

22  A.  Christine Brital, yes.

23  Q.  And she was with you?

24  A.  Yes.

25  Q.  How big was the room foot-wise?

1  A.  I would say it was maybe 12 feet by eight feet.

2  Q.  So a relatively small room.

3  A.  Yes, sir.

4  Q.  All right.  And was there a table in the room?

5  A.  Yes, it's pushed back from the corner.

6  Q.  Okay.  And the door is behind where Mr. Connors was seated,

7  isn't it?

8  A.  Yes, sir.

9  Q.  That's one of the techniques you've been taught, is always

10  sit the person that's being interviewed with his or her back to

11  the door.

12  A.  No, I have not been taught that.

13  Q.  Is it a practice that you have found effective?

14  A.  I position myself for interviewing where I can speak with

15  the person directly, if I'm interviewing them, or if I'm in the

16  interview, that I can read their body mannerisms.  I put them

17  in a position where I'm also concerned for my safety as a

18  female, as a petite female, so I don't want to be too close to

19  them, but I don't want to give them any sort of room where they

20  can be physical or harm me.

21  Q.  You were with another officer at the time?

22  A.  Yes, sir.

23  Q.  And what is the qualifications that Ms. Brital has as an

24  officer?  In other words, is she also Homeland Security

25  officer?

1    A.   Yes, sir, she's a special agent with the Homeland Security.

2    Q.   She's also authorized to be armed?

3    A.   Yes, sir.

4    Q.   And both of you were armed when you are sitting down with

5    Mr. Connors?

6    A.   No, sir.

7    Q.   Neither one of you has a weapon?

8    A.   I don't know if Ms. Brital had her firearm on her, but

9    basically, initially from the stop, we were in what we would

10   call tactical gear, so we had protective vests, we had our

11   firearms, and upon interviewing, it was cold, we took our -- at

12   least I took my firearms off, secured them outside of the

13   interview room, left my vest and everything, just because it

14   was comfortable.

15   Q.   Did you sit Mr. Connors between the two of you?

16   A.   No, sir.

17   Q.   Where was Mr. Connors seated relative to you and

18   Ms. Brital?

19   A.   He was sitting near the table.  We provided him with some

20   water and some coffee.

21   Q.   Okay.

22   A.   And myself, I was sort of catty-corner to him, and then

23   Christine was to my right.

24   Q.   And Terry Connors is seated between the two of you?

25   A.   Yes, I guess.  A bit further away from us, yes, sir, I'm

1    sorry.

2    Q.  But I'm a little familiar with this technique.  You've got

3    each officer on one side, and a subject is in the middle.  All

4    right?  So we can agree on that.

5    A.  Yes, sir.

6    Q.  That's how it was on the date the late evening, I guess it

7    is --

8    A.  Yes, sir.

9    Q.  -- and early morning hours, perhaps, of December 17 and

10   18th.

11       Now, did you have any written material with you?

12   A.  I don't understand that question.

13   Q.  Did you have a notebook, or did you take notes of the

14   interview?

15   A.  Yes, sir.

16   Q.  Did your colleague, Ms. Brital, take any notes?

17   A.  Not that I recall.

18   Q.  All right.  Is that a practice and a standard which you

19   have either been trained in, or you've come to practice, where

20   when you have two officers conducting an interview, only one of

21   them takes notes?

22   A.  I understand that question, and, no, at least it is not

23   within policy.  I've seen it done both ways.  My Department of

24   Labor, both people have taken notes.  Other interviews, only

25   one person takes notes.  Sometimes they combine the notes.  But

1    in terms of me taking notes that day and Christine not taking

2    notes that day, it was not because of that tactic or technique.

3    Q.  That is a tactic practiced, or technique -- you used the

4    word "technique."  That is a technique of some of your

5    colleagues, isn't it, to have only one of the two officers

6    taking notes?

7    A.  I've never had an open discussion with anybody about that,

8    but my observations, I've seen both parties taking notes or one

9    person taking notes.

10   Q.  There is no question my client was in custody when he was

11   speaking to each of you.

12   A.  That's correct.

13   Q.  There is no question that before any -- as you understand

14   the law, before anything he said could be admitted, that he has

15   to knowingly and voluntarily waive his right to remain silent

16   and the other rights described in the Miranda warnings.

17   A.  Yes, sir.

18   Q.  Okay.  Now, do you recall if Mr. Connors ever read the card

19   you claimed to have given him?  Did he ever read it silently?

20   A.  I remember him reading it.  I remember him verbally

21   listening to it, and then I remember him taking some time to

22   look at it, and -- yes, I believe he read it.

23   Q.  You believe that he read it while you were reading it or

24   how did -- I'm trying to understand if you're reading off a

25   paper, or are you reading off a card at the time you are giving

1  him his Miranda warning?

2  A.   Both.   So initially, we read -- I read the card to him.

3  Typically, what we like to do is we like to have -- it's a

4  standard HSI Miranda form where it has our logo, and we have

5  the individual sign it and date it.   Basically, it is saying,

6  "Yes, I've been mirandized."   Because we were out in the field

7  and we were away from our office, I didn't have that form, but

8  I wanted to document the fact that we were providing both

9  Mr. Connors and Mr. Jones their Miranda.   So I read them a

10  card, and then we had asked one of the agents to make copies of

11  the cards so that then I could be brought back with that piece

12  of paper, re-mirandize them and ask them to sign it and initial

13  it if he understood and waived those rights.

14  Q.   So they bring you back one copy of the Miranda.

15  A.   Yes, sir.

16  Q.   You read it again, as you recall.

17  A.   Yes, sir.

18  Q.   And then you hand it to him for him to sign?

19  A.   Yes, sir.

20  Q.   All right.   Did your colleague, Ms. Brital, make any --

21  read any of these, as you recall, read the Miranda at all to

22  him?

23  A.   I don't recall.

24  Q.   Did you ever -- do you recall if at any time you read the

25  Miranda warnings, or the equivalent, at a later point in the

1   interview?

2   A.   No, sir, it was prior to us interviewing Mr. Connors.

3   Q.   How long did the interview last, as you recall it?

4   A.   The interview with -- I guess when he's making admissions

5   and telling us specifically what was going on, I would say it

6   was probably about an hour and a half.  And then we traveled

7   back to Albuquerque, and while in Albuquerque, we were going

8   through paperwork, and he's freely speaking with myself and

9   Agent Martin.

10   Q.   Were you taking any notes of the trip back to Albuquerque?

11   A.   I did not transport him back to Albuquerque.  It is my

12   understanding that they were transported in a vehicle that

13   Agent Martin had described, a caged vehicle.  And that they had

14   slept the way back.

15   Q.   If this case were to go to trial, your testimony would be

16   entirely regarding statements my client is alleged to have made

17   when he was speaking to you in Gallup at the station.

18   A.   Yes, sir.

19   Q.   Now, you've been present throughout the hearing this

20   morning.

21   A.   Yes, sir.

22   Q.   You heard Officer Martin testify.

23   A.   Yes, sir.

24   Q.   Now, when you were interviewing my client late on December

25   17, who was asking the questions as far as you or Ms. Brital?

1   In other words, was one of you an observer and the other

2   listening?

3   A.   I was doing the majority of the -- I was doing the majority

4   of the interview in terms of asking questions.  If there was a

5   question that Agent Brital wanted to have answered, she was

6   more than welcome to ask additional questions.  Then later,

7   Agent Verhulst was also in the room sort of at the end of the

8   interview.

9   Q.   Now, the only way we'll know exactly what Mr. Martin and my

10  client discussed as he was describing it in his portion of the

11  testimony, the only way we would know is if we had a recording,

12  wouldn't it?

13  A.   No, sir, I was present for that.

14  Q.   You were present for my client's statements to Mr. Martin

15  back in Albuquerque?

16  A.   Yes, sir.

17  Q.   I thought my earlier question --

18  A.   I'm sorry, I must have misunderstood.

19  Q.   I apologize if I didn't make that clear.  You also might be

20  able to testify regarding Mr. Martin and his interview with my

21  client regarding the eventual search of my client's apartment?

22  A.   Yes, sir.

23  Q.   All right.  But the only way we're going to know who asked

24  what question, really, and remember it exactly and what words

25  were used, would be if we had a recording.

1  A.  Yes, sir.

2  Q.  Okay.  And of course, as Mr. Martin said no recording was

3  made of his interview.

4  A.  That's correct.

5  Q.  And -- I'm going to ask you the same question.  Was any

6  recording made of the interview you had with Ms. Brital my

7  client in Gallup?

8  A.  No, sir.

9  Q.  All right.  And that's just a matter of policy, apparently.

10  A.  As far as I'm aware as an agent when I'm conducting federal

11  investigations, I don't know of a mandate or court decision

12  that would suggest that that's what we need to do when we're

13  conducting our interviews.  I take notes so that I can reflect

14  on what is told to me, but I'm not aware of any policy asking

15  that I record interviews of individuals.  I believe that my

16  reports and my note-taking are accurate.

17  Q.  Well, good.  We're going to talk about your notes a little

18  bit this afternoon.  I think it's good, very interesting.  I'm

19  glad you mentioned that you're not aware of any court mandates.

20  You are aware that the judge in this case as recently, as three

21  days ago, issued a ruling where she encouraged the FBI to

22  record their interrogations.

23  A.  I am not aware of that, sir.

24  Q.  Let me ask you -- I'm going to give you a quote from a

25  footnote, and see if you agree with this footnote.

1          THE COURT:  Counsel, I would ask that you move on.  I

2    don't think that's relevant.

3          MR. SAMORE:  Judge, I don't want to argue -- there is

4    no objection.

5          THE COURT:  What is the relevance, sir?  I think we

6    have an attorney standing up, so --

7          MR. CAIRNS:  That's Judge Armijo's opinion in a

8    different case.  I have no knowledge as to the facts of that

9    case, whether they are different or similar to the facts of

10   this case.  To ask an agent to opine as to a judge's opinion, I

11   think is incorrect.  Again, it is not -- he's not even

12   eliciting fact testimony from the witness.  He's eliciting

13   opinion testimony which is the realm -- the province of an

14   expert witness, not a lay witness.

15         THE COURT:  And I don't understand the relevance of a

16   Judge Armijo opinion that she did in another case three days

17   ago.

18         MR. SAMORE:  Judge, the witness brought it up here in

19   answer to my question.

20         THE COURT:  What did she bring out?

21         MR. SAMORE:  She said "I'm not aware of any opinion" --

22   I would defer to the gentleman's record -- "any opinion that

23   was to the effect of a judge saying that we should record these

24   statements," and here is a quote from the FBI standard in a

25   footnote, and also the judge's opinion.

1          THE COURT:  She's just answered she's not aware of it,

2     so what is the relevance, Counsel?

3          MR. SAMORE:  Okay.  I think the opinion issue came up.

4     I'm going to ask about whether it was recorded for accuracy.

5     And I was --

6          THE COURT:  You asked that, Counsel.

7          MR. SAMORE:  All right.  I hear what you say, Judge.

8     Q.  (By Mr. Samore)  Prior to my client making any statement to

9     you regarding the substance that we find in your report where

10    he's apparently making incriminating admissions, did you have

11    any discussion or have any other chat with him about his

12    predicament?

13    A.  Could you clarify?

14    Q.  Sure.  Did you have any other conversation with him prior

15    to any admissions that he made?

16    A.  No, sir.

17    Q.  So your testimony is that right when you sat down, you

18    didn't discuss things like we would like to hear your side of

19    the story, or we'd like to talk to you today?  We'd like to

20    know what happened.  We'd like to say something good about you

21    to the prosecutors.  Anything to that effect?

22    A.  The only statements that I remember being exchanged is him

23    asking, "Why am I here?  What's going on?"  And so we said,

24    "We're going to place you in this room, and we will provide you

25    with an explanation as to why you're here in just a few

1    moments."

2        In terms of any conversation after that or him speaking to

3    us, if you're alluding to whether it was before Miranda, no,

4    there were no statements that he had provided prior to him

5    being mirandized.

6    Q.  You described today your confidence in your note-taking.

7    A.  Yes, sir.

8    Q.  Did you provide Mr. Connors a pen and paper so he could

9    take some notes of the conversation?

10   A.  No, sir.  He didn't ask for it.

11   Q.  So the only notes and the only record we have of this

12   conversation lacking a recording is your notes and your

13   recollection.

14   A.  Yes, sir.

15   Q.  And the parties' recollection, Ms. Brital's and my

16   client's.

17   A.  Yes, sir.

18   Q.  Now, I am going to ask you -- because I think it's relevant

19   to what my client may testify to if we call him later.  With

20   the court's indulgence, I'm going to ask you a couple of

21   questions about the notes that you have relative to the report

22   because it relates to our motion.  So I'm trying to let you

23   know where I'm going with that.

24   A.  Yes, sir.

25            MR. SAMORE:  I have made a copy of pages 18 to 28 of

1  discovery that is this agent's notes.  May I approach and

2  present it to her?

3           THE COURT:  You may, yes.

4  Q.  (By Mr. Samore)  Does that appear to be your notes?

5  A.  Yes, sir.

6  Q.  I think I'm going to warn you, because I've had a chance to

7  go through them in preparation for today, I think a couple of

8  pages are repeated, but I'm going to make some references

9  probably to those reports as I wrap up my cross examination,

10 ma'am.

11 A.  Yes, sir.

12 Q.  Those notes that you have were taken the date of the

13 interview with my client.

14 A.  Yes, sir.

15 Q.  All right.  And those notes were provided from you to the

16 government, and they haven't been amended by anything after

17 that interview.

18 A.  No, sir.

19 Q.  Did you take any notes during your time sitting with my

20 client and Mr. Martin?

21 A.  No, sir.

22 Q.  Now, we have also a report that was details of the

23 investigation that was found in discovery pages 14 to 16.

24 That's typed.  That was yours, too, wasn't it?

25 A.  I believe so, yes.

1          MR. SAMORE:  May I give the witness a copy, Judge?

2          THE COURT:  Yes, sir, certainly.

3          MR. SAMORE:  May I approach, Judge?

4          THE COURT:  You may.

5    Q.  (By Mr. Samore)  Now, for purposes of, I think, this

6    examination, I don't need to offer these as exhibits, but I am

7    going to ask you to read from those, and if my colleague or the

8    court wants me to identify them, I will not have them marked as

9    exhibits, but it is more as refreshment.

10         What I have provided to you, please confirm that we have

11   the same copies as pages 14 to 16 of discovery that's the

12   report, and 18 to 28 that's your notes.  Am I correct?

13   A.  No, sir.  The report that I have in here, the topic is

14   "Arrest of Terrence Connors and Thomas Jones," and the

15   signature and the typist is Special Agent Martin.

16   Q.  Oh, okay.  That's 14 to 16 is Mr. Martin's.

17   A.  Yes, sir.  Assuming that your 14 -- I don't have an exhibit

18   number on this, so --

19   Q.  Yes, we have the same, lower right-hand corner is 14.

20   A.  I don't think I have the same as you, I'm sorry, sir.

21         MR. SAMORE:  May I approach, Judge, make sure we have

22   the same copy?  May I approach?

23         THE COURT:  You may.

24   Q.  (By Mr. Samore)  I think I have the pages now.  I'm sorry.

25   Do we have the right pages now, I hope?

1  A.  Yes, sir.

2  Q.  Okay.  Thank you.  How long a drive was it, if you recall,

3  from the time you left the field, which was one of my initial

4  questions, until you got back to the station?

5  A.  Probably about 20 minutes.

6  Q.  From that to Gallup, from the field to the Gallup station

7  where you interviewed my client?

8  A.  Yeah, I would say that's about accurate.

9  Q.  Did you leave at the same time my client left the field, or

10 did you leave at a later time?

11 A.  I think we sort of all left together.  There were some

12 agents that I instructed to stay behind to secure the vehicle

13 and move forward with the K-9 aspect and search of the vehicle,

14 and then there were agents that I asked to assist in

15 transporting Mr. Jones and Mr. Connors to the nearby station.

16 Q.  Had Officer Ronk and the dog car arrived in the field

17 before you left the field site to go back and start the

18 interview with my client?

19 A.  No, sir.  There were concerns of the K-9 Unit was a

20 Farmington unit, and so I had asked to wait to have the

21 Farmington marked unit arrive after Mr. Connors and Mr. Jones

22 had already left the scene.

23 Q.  When you went to the room to interview my client, was he

24 already present in the room at the station, or did you go first

25 and wait for him?

1    A.  I don't remember.  It was sort of all at the same time.

2    Q.  Do you know where he had been held from the time he arrived

3    at the station until the time he arrived in the room to be

4    interviewed?

5    A.  I don't believe that he was held -- he was transported in a

6    vehicle, and upon exiting the vehicle, he was escorted into the

7    interview room.

8    Q.  I think in light of your testimony, I'm going to make my

9    questions very limited about a reference -- references that I

10   find comparing your report, 14 to 16, to the notes.  My

11   preliminary question is, aren't you trained to put in your

12   report as many things of significance as you can recall or as

13   occur in an interview?

14   A.  That's the hope, yes, between the report and the notes.

15   Q.  And if you don't have it in the report, it should probably

16   be in the notes.  Wouldn't that be a fair conclusion?  Because

17   you have said your notes are pretty accurate.

18   A.  Yes, or through recollection.

19   Q.  Well, when you're writing your notes, aren't you trying to

20   write down everything of importance that you hear from the --

21   A.  Yes, sir.

22   Q.  -- witness, or whomever, or the suspect, or in this case

23   the person in custody?

24       Here is the direction I'm going on my final couple of

25   questions.  I see references in the report that are confirmed

1   in the notes for virtually everything that you have described

2   in the report.  The one thing I can't find is the bottom of

3   page 15 and the top of page 16, I can find no reference to the

4   sentence that begins -- this is on page 15, "Connors also

5   stated," and through that paragraph, the last three words being

6   "in a parking lot."  I can find no reference to that anywhere

7   in any of the notes, and I ask you if you can see a reference

8   to it that I missed.

9   A.  If the statement or -- if it's not in the notes, it is

10  something that I felt I needed to put in the report based on my

11  recollection of the interview.

12  Q.  There is not -- it is not a trick question.  I'm just

13  saying maybe I missed it.  And if the court will indulge us

14  just a minute or two so you can glance through and see if you

15  can pick it up.

16  A.  With reference to the scales, he also stated that he keeps

17  ammunition, magazines, digital scales, baggies, pipes in his

18  residence, I believe it's page 24 of my notes.  I listed the

19  firearms he told me that he had, the ammunition, the scale, the

20  baggies, the pipes.

21  Q.  This reference here at the bottom of 15 that says "all are

22  within close proximity to where he keeps the methamphetamine,"

23  is that your conclusion, or is that his words?

24  A.  Yes, he said he lives in a very small space, and all of it

25  was within close proximity to where he was keeping his

1    methamphetamine, yes.

2    Q.   Is there any reference in the notes that says, "Connors

3    typically deals methamphetamine out of his residence or at a

4    nearby parking lot," or is that your conclusion from --

5    A.   If it is in my report as a statement, it would have been

6    something that he told me.

7    Q.   But you don't see that sentence quoted anywhere in these

8    rather detailed notes that you took.

9    A.   Not that I see, no.

10   Q.   And we do -- as the case agent, you're well aware that we

11   have at least two other recordings of various aspects of this

12   case that were played to the court this morning.

13   A.   Yes, sir.

14   Q.   Okay.  The decision not to record that interview or the

15   Miranda warning is a decision that you make as a case agent,

16   isn't it?

17   A.   Yes, sir.

18        MR. SAMORE:  Thank you very much.  Pass for cross

19   examination.

20        THE COURT:  Mr. Samore, the way that I do these

21   hearings is after the conclusion of the evidence, when the

22   transcript is ready, I ask the lawyers to do findings and

23   conclusions, and you're welcome to state Judge Armijo's opinion

24   as a legal conclusion.

25        MR. SAMORE:  Very good, Judge, thank you.  For the

1    record, again, I don't think it's necessary to reference those

2    notes, unless the court feels it would support, I will conclude

3    my examination, thank you.

4            THE COURT:  Mr. Robert.

5            MR. ROBERT:  Thank you, Your Honor.

6                        **CROSS EXAMINATION**

7    **BY MR. ROBERT:**

8    Q.  Agent Kepf, you hadn't heard of Mr. Jones prior to the 17th

9    of December of last year, have you?

10   A.  No, sir.

11   Q.  His name hadn't come up in your preliminary work on the

12   investigation of Mr. Connors?

13   A.  No, sir.

14   Q.  And during the course of the investigation, you learned

15   that all he got out of this was, every time he drove, he got an

16   eight ball, three-and-a-half grams of meth?

17   A.  Yes, sir.

18   Q.  Money?

19   A.  Not that I was aware of.

20   Q.  You testified a little bit ago that -- I'm not quite sure I

21   understand, but that you had requested that the Farmington K-9

22   officer not come to the scene until you had left with

23   Mr. Connors and Mr. Jones?

24   A.  Yes, sir.

25   Q.  So at the time at which the dog arrived, neither of them

1   were present.

2   A.   That's correct.

3   Q.   And you had already left the scene at that point to go

4   participate in the interrogation of Mr. Connors.

5   A.   In his interview, yes.

6   Q.   You were not present, then, when the dog was run on the

7   car?

8   A.   No, sir.

9   Q.   You weren't present at the time at which, according to

10  Officer Ronk, the dog alerted onto parts of the vehicle?

11  A.   I was not present.

12  Q.   And yet when you were involved in the interrogation of

13  Mr. Connors, you were aware that there was a significant

14  quantity of methamphetamine was found in the car.

15  A.   Yes, sir.

16  Q.   And you left before the dog had done his work.

17  A.   That's correct.

18  Q.   Would you explain that for us?

19  A.   Upon the search of the vehicle, the agents drove the

20  vehicle and brought back to the police station the

21  methamphetamine, the contents that were found in the vehicle.

22  Q.   Is it your testimony that -- first, is it your testimony

23  that that occurred prior to your beginning the interrogation of

24  Mr. Connors?

25  A.   No, sir.   I believe it to have taken place all at the same

1    time.

2    Q.  How did that information come to you in terms of physical

3    logistics as you were involved in discussing things with

4    Mr. Connors?

5    A.  Mr. Connors was placed in the interview room.  We were

6    asking background information, where he was traveling to, where

7    he was coming from, what sort of employment he had, those types

8    of questions.  And then agents are either calling me or

9    notifying other agents that are already at the police station

10   would be on scene, and then once the vehicle was searched on

11   the side of the road, they drive the vehicle to the substation,

12   and anything that they found in the vehicle relevant to us

13   asking questions was then brought in and brought to our

14   attention.

15   Q.  Your testimony to the court, then, today is that, at the

16   time at which you left the scene to go back to the substation

17   to conduct this interview, you didn't know what they found in

18   the car?

19   A.  That's correct.

20   Q.  All right.  Were you present during the interview of

21   Mr. Jones?

22   A.  No, sir.

23   Q.  All right.

24          MR. ROBERT:  That's all.

25          THE COURT:  Redirect.

1           MR. SAMORE:  Judge, may I ask one question?

2           THE COURT:  One.  You can ask one.

3                   **CROSS EXAMINATION (Continued)**

4    **BY MR. SAMORE:**

5    Q.  Based on your recollection, from the time Mr. Connors

6    signed the Miranda copy that was introduced into evidence until

7    the last admission that you feel he made in your notes and in

8    your report, how much time passed?

9    A.  My interview, my note interview, or the notes that I have,

10   were with reference to the interview that took place in Gallup,

11   so I would venture to say that that interview lasted

12   approximately an hour and a half.

13           MR. SAMORE:  That's it.

14           THE COURT:  Thank you.  Redirect.

15                   **REDIRECT EXAMINATION**

16   **BY MR. CAIRNS:**

17   Q.  During these interviews, whether you record or do not

18   record, is it custom to have two agents present during the

19   interview?

20   A.  Yes, sir.

21   Q.  In fact, is that HSI policy?

22   A.  Yes, sir.

23   Q.  And is that to ensure that the interview is accurately

24   recorded?

25   A.  Yes, sir.

1          MR. CAIRNS:  That's all the questions I have.

2          THE COURT:  Thank you.  You may step down.

3          Is your next witness available, Counsel?

4          MR. CAIRNS:  The government calls Homeland Security

5     Investigations Agent Christine Brital.

6          THE COURT:  Would you please raise your right hand?

7                          **CHRISTINE BRITAL,**

8     after having been duly sworn, testified as follows:

9                          **DIRECT EXAMINATION**

10    **BY MR. CAIRNS:**

11    Q.  Please state your name for the record.

12    A.  Christine Brital, B-R-I-T-A-L.

13    Q.  Where are you currently employed?

14    A.  I'm a special agent with the Department of Homeland

15    Security.

16    Q.  Were you present on December 17, 2012, when Defendant

17    Connors was interviewed by Agent Kepf?

18    A.  I was.

19    Q.  Did you or Agent Kepf explain to Mr. Connors his Miranda

20    warning prior to the interview taking place?

21    A.  Yes.

22    Q.  I'm going to hand you what's been marked and admitted as

23    Government's Exhibit 2.  Is that the photocopy of the Miranda

24    warning that was provided to Mr. Connors?

25    A.  Yes, sir.

1    Q.   Was that also explained to him verbally prior to that?

2    A.   Yes.

3    Q.   Is that your signature as well on this document?

4    A.   Yes.

5    Q.   And does that signature indicate that this warning was

6    provided to Mr. Connors?

7    A.   That I witnessed it, yes.

8              MR. CAIRNS:  That is all the questions I have.

9              THE COURT:  All right.  Cross examination.

10                        **CROSS EXAMINATION**

11   **BY MR. SAMORE:**

12   Q.   Prior to testifying today, what documents, notes, reports,

13   have you reviewed to prepare to testify?

14   A.   I read the report, I believe number 2 and number 3, that

15   are part of this case file, which number 2, I believe was the

16   stop, number 3 was the interview of Mr. Connors.

17   Q.   Excuse me, was that the interview by you and Agent Kepf at

18   the Gallup station?

19   A.   Yes, sir.

20   Q.   Okay.

21   A.   We've talked in a group prior to this hearing.  I believe

22   that's pretty much it.

23   Q.   Did you review Agent Kepf's notes?

24   A.   I did.  I did.  I'm sorry.

25   Q.   Do you have any recollection of the interview of my client

1   other than what was found in those notes or found in the

2   report?

3   A.   Not really.   I don't know exactly what you're trying to

4   assess.

5   Q.   We haven't received a report from you, I don't believe.

6   A.   No, I did not provide a report.

7   Q.   You weren't taking notes.

8   A.   No.

9   Q.   All right.   You weren't recording the interview?

10  A.   No.

11  Q.   The only people present in the room when you spoke to my

12  client was your fellow agent and my client.

13  A.   Agent Kepf was there.   Myself, Mr. Connors was there.   And

14  for a period of time, Devin, I don't know his last name, a

15  Region II officer, had been in the room.

16  Q.   When did he come in the room?

17  A.   After Miranda had been read, provided basic information.   I

18  believe, I would say maybe 15 minutes or so into the interview.

19  10, 15 minutes.

20  Q.   From the time you recall my client signing the Miranda

21  until his interview was concluded with the final admissions or

22  statements that you believe he made, how much time passed?

23  A.   I would have to review notes.   I don't know.

24  Q.   Did you make an entry anywhere what time you went into the

25  station house?

1  A.  The Miranda has 11:34, so that's what time that it was

2  witnessed.  That he was read his Miranda rights.  I don't know

3  what time it concluded.

4  Q.  Was there any discussion prior to him signing the Miranda

5  of anything involved in this case that you can recall?

6  A.  I don't know.

7  Q.  Did Mr. Connors ask any questions about his rights?

8  A.  I don't recall.

9  Q.  Did Mr. Connors independently, silently, with no one else

10  talking, read the rights?  By the rights, I mean the card.

11  A.  Right.  In all honesty, I don't recall.

12  Q.  Do you remember if you read his rights to him at any time?

13  A.  I believe it was Agent Kepf.

14  Q.  Do you recall if she read the rights one time or more than

15  one time?

16  A.  I believe it was once, but that's my recollection.

17  Q.  And after she -- did she read the rights from a card to him

18  or from memory, or did she read the rights from a copy of a

19  sheet of paper that he eventually signed and now it's been

20  admitted as an exhibit?

21  A.  It would be from this form.

22  Q.  Was it the form, regular eight-and-a-half by 11?

23  A.  Just like this.

24  Q.  Just like that.  Not on a card?

25  A.  Well, it is from a card.  It is a copy of a card.

1   Q.   Okay.  So there was a small copy on the page.  I'm going to

2   ask you to please keep eye contact with me because I still feel

3   you're looking over to the agent.

4   A.   No, I'm looking at the -- what you're asking about.

5   Q.   Thank you.  And normally -- let's just say more commonly,

6   you would have a full page of Miranda rights rather than that

7   small copy, wouldn't you?

8   A.   If it is available, yes.

9   Q.   But it wasn't available in this instance?

10   A.   We made do with what we had, and he was advised of his

11   rights.

12   Q.   How long did that gentleman stay in the room with you when

13   the interview was going on?

14   A.   He was there for, I would say, approximately half of the

15   interview.  I don't know exactly how long the interview lasted.

16   Q.   Do you know if he was taking notes?

17   A.   No.

18   Q.   Was he asking questions?

19   A.   Yes.

20   Q.   Where was he seated?

21   A.   He was standing for a period of time.  I don't know if he

22   sat down ever.

23   Q.   Where was he standing relative to my client?

24   A.   If the AUSA is your client and I am -- I would probably be,

25   I don't know, another -- I don't know how you want me to

1   describe this.  Do you want me to stand up and get closer?

2   Q.  Just so Judge Garza can understand your description and

3   show relative distance.

4   A.  Okay.  Approximately -- I was sitting approximately four

5   feet from the defendant, as was Agent Kepf.  Devin, when he

6   came in, was standing against the wall, so he was maybe five

7   feet from the defendant.

8   Q.  All right.  The room is how big?  Does an eight-by-12-feet

9   room, is that about the size of the room?

10  A.  Sure.  I don't...it was probably -- yeah, I guess somewhat

11  near that.  I'm sorry, I didn't measure the room prior to

12  actually doing the interview.

13  Q.  Pretty small room, can we agree on that?

14  A.  It wasn't huge, no.

15  Q.  Plastic chairs or wood or metal chairs?

16          MR. CAIRNS:  I think we're getting pretty far afield

17  here.  I know the Rules of Evidence don't apply, but plastic or

18  metal chairs?

19          THE COURT:  I don't know the relevance.

20          But please answer, and let's move on.

21  A.  I don't recall the type of chairs.

22  Q.  (By Mr. Samore)  How big was the table?

23  A.  Four by two, maybe.  I don't -- I didn't measure -- take

24  out a ruler and measure the room or the space.

25  Q.  Pretty small table?

1   A.   It's not a huge table, no.

2   Q.   Have you been in that room before?

3   A.   No.

4   Q.   Or since?

5   A.   No.

6   Q.   Okay.  Do you remember taking a picture of a phone and

7   sending a text message to someone's phone, one of these two

8   suspect's phone, and sending a message to the dealer?

9   A.   Mr. Connors typed in a message, and I took a picture of his

10  phone, yes, with a message on it.

11  Q.   All right.

12          MR. SAMORE:  Thank you, no further questions.

13          THE COURT:  Mr. Robert?

14          MR. ROBERT:  No questions, Your Honor.

15          THE COURT:  All right.  Redirect.

16          MR. CAIRNS:  No redirect.

17          THE COURT:  May this agent be permanently excused?

18          MR. CAIRNS:  Yes, Your Honor.

19          THE COURT:  Please step down.  I understand the

20  government has one additional witness.  I'm going to take a

21  very brief recess, maybe five to seven minutes.

22          Counsel, I would like for you to confer to your clients

23  to determine if they are going to testify at the conclusion of

24  this hearing.  I'm not going to take another break to do that.

25  Then we will discuss your motion to provide additional

1  information.  All right?

2     (Court recessed at 12:49 p.m. to 12:55 p.m.)

3         THE COURT:  Court's back in session.

4         Please call your next witness.

5         MR. CAIRNS:  Government calls Homeland Security Special

6  Agent John Dennis.

7         THE COURT:  Please come forward and please raise your

8  right hand.

9                      **JOHN DENNIS,**

10 after having been duly sworn, testified as follows:

11                  **DIRECT EXAMINATION**

12 **BY MR. CAIRNS:**

13 Q.  Good morning.  Please state your name for the record.

14 A.  Special Agent John Dennis, Homeland Security

15 Investigations.

16 Q.  How long have you been with HSI?

17 A.  Two-and-a-half years, sir.

18 Q.  Did you participate on December 12, 2012, in the interview

19 of Mr. Jones?

20 A.  Yes, sir.

21 Q.  Prior to the interview of Mr. Jones, did you or another

22 agent read Mr. Jones his Miranda rights?

23 A.  Yes, sir.

24 Q.  Was he also provided with a written copy of the Miranda

25 warning?

1  A.  Yes, sir.

2  Q.  If I might approach, I'm handing you what's been marked as

3  Government's Exhibit Number 4.  Can you tell me what that is?

4  A.  Yes, sir.  It's a copy of the Miranda card I carry with my

5  credentials, and it is the signature of Mr. Jones.

6         MR. CAIRNS:  I move for the admission of Government's

7  Exhibit Number 4.

8         THE COURT:  Any objection, Counsel?

9         MR. ROBERT:  No, objection.

10        THE COURT:  Number 4 will be admitted.

11     (Government's Exhibit 4 admitted.)

12  Q.  (By Mr. Cairns)  Was this warning provided to him before he

13  answered any questions?

14  A.  Yes, sir.

15  Q.  And did he -- let me strike that.  Did he agree to -- after

16  being read these rights, did he agree to answer questions?

17  A.  Yes, sir, he was provided the opportunity -- I verbally

18  read the rights to him, and then I had him read the card and

19  then sign the form.

20  Q.  Is that his signature on there as well?

21  A.  Yes, sir.

22        MR. CAIRNS:  That's all the questions I have.

23        THE COURT:  All right.

24

25

1                          CROSS EXAMINATION

2  BY MR. ROBERT:

3  Q.  There were several people, investigating agents, in the

4  room during the time that you questioned Mr. Jones, right?

5  A.  No, sir.  It was myself, a lieutenant from Region II Task

6  Force, and one other deputy from the Region II Task Force, so

7  it was three of us total.

8  Q.  Was there a masked individual in the room?

9  A.  Not that I was aware.

10  Q.  Wouldn't you be aware of a masked individual in a small

11  room?

12  A.  It wasn't a small room, sir; it was a conference room with

13  multiple tables, like a briefing-type room.

14  Q.  Let me change the question.  If there were somebody wearing

15  a balaclava or some kind of mask, you would have noticed,

16  wouldn't you?

17  A.  I was facing Mr. Jones with my back to the majority of the

18  room.  So he could have come in or left, but I don't remember,

19  to the best of my memory, seeing an individual in a balaclava.

20  Q.  Do you remember Agent Kepf being in the room?

21  A.  Not at the time during my questioning.

22  Q.  I'm not sure why you're limiting your answer that way.  Was

23  there ever a time during the time that Mr. Jones was in the

24  room that Agent Kepf was in the room, too?

25  A.  I do not remember her staying in the room.  I know people

1   are coming in and out of the room throughout the questioning,

2   but I do not remember her staying in the room.

3   Q.  Staying in the room implies being in the room at some point

4   and then not being there for very long.  Is that what you're

5   telling us?

6   A.  No, sir, I do not remember who exactly came through the

7   room.

8   Q.  Did you make any kind of report regarding your questioning

9   of Mr. Jones?

10  A.  Yes, sir, I did.

11  Q.  Do you have it with you?

12  A.  I do not have a copy personally with me.

13  Q.  Okay.  To whom did you provide this report that you

14  prepared?

15  A.  I provided it to the case agent, sir.

16  Q.  That would be Agent Kepf who is sitting here, right?

17  A.  Yes, sir.

18          MR. ROBERT:  May I approach?

19          THE COURT:  You may.

20  Q.  (By Mr. Robert)  Is this your report?

21  A.  It appears to be a copy of the report, sir.

22  Q.  Is there anything else in writing that you prepared or are

23  aware of relating to your interview of Mr. Jones?

24  A.  No, sir.

25  Q.  In the report, it says that there were John, J. D. Dennis,

1    and representatives from Region II Narcotics Task Force

2    interviewed Thomas Jones.

3    A.  Yes, sir.

4    Q.  But you don't recall who those representatives might have

5    been?

6    A.  I know one of them for sure was a Lieutenant Haws from

7    Region II Task Force.

8    Q.  How long did it take to conduct the interrogation?

9    A.  It was not an interrogation, sir; it was just an interview.

10   Q.  Okay.  Whatever you want to call it, how long did it take?

11   A.  I'm not sure on the exact time without referring back to my

12   report; but the best of my memory, I think it probably took no

13   longer than 45 minutes max.

14   Q.  If the report says 2330 begin, 0050, which is 10 until

15   1:00, end, that's about an hour 20 minutes by my calculations.

16   Does that sound about right to you?

17   A.  Yes, sir.

18              MR. ROBERT:  A moment, Your Honor?

19              THE COURT:  Certainly.

20              MR. ROBERT:  That's all, thank you.

21              THE COURT:  Mr. Samore, do you have any questions?

22              MR. SAMORE:  No, Judge.

23              THE COURT:  Do you have any redirect?

24              MR. CAIRNS:  No, Your Honor.

25              THE COURT:  May this agent be permanently excused?

1          MR. CAIRNS:  Yes, Your Honor.

2          THE COURT:  Does the government have any other

3   witnesses?

4          MR. CAIRNS:  No, Your Honor.

5          THE COURT:  All right.  Mr. Samore, does your client

6   wish to testify?

7          MR. SAMORE:  I believe we're going to put Mr. Connors

8   on for a very narrow issue, and I would just like to talk to

9   him for maybe one minute.  I can do it in court.  He just got

10  back to the court right before we went back in session.

11         THE COURT:  Go ahead and talk to him.

12         Mr. Robert?

13         MR. ROBERT:  Mr. Jones will not testify.

14         THE COURT:  Thank you.

15         MR. SAMORE:  Judge, we would call Terrence Connors.

16         THE COURT:  All right, Mr. Connors, please come

17  forward.  Can we remove his right handcuff so he can be sworn?

18         DEPUTY MARSHAL:  Yes, Your Honor.

19         THE COURT:  All right, that's fine, sir.  Go ahead.

20                      **TERRENCE CONNORS,**

21  after having been duly sworn, testified as follows:

22         THE COURT:  And you are giving this testimony after

23  conferring with your attorney?

24         THE WITNESS:  Yes, Your Honor.

25         THE COURT:  Go ahead and have a seat.

1                    **DIRECT EXAMINATION**

2    **BY MR. SAMORE:**

3    Q.   Mr. Connors, what is your height and weight as best you

4    know today?

5    A.   199, and I'm five-foot ten.

6    Q.   What was your height and weight back in December of 2012?

7    A.   I think I was at 165 and five-foot ten.

8    Q.   I'm going to turn your attention to the testimony of

9    Officer Chris Martin that you heard today.  Did you hear that

10   testimony?

11   A.   Yes, sir.

12   Q.   Do you recall meeting with Officer Martin in Albuquerque

13   the early morning of December 18, 2012?

14   A.   Yes.

15   Q.   Do you remember at what time of day you had that meeting?

16   A.   It was early in the morning, six-ish, something like that.

17   Q.   Was anyone else present at that meeting?

18   A.   I think it was just him and I.  Maybe Abbey.

19           THE WITNESS:  I can't remember your last name, I'm

20   sorry.

21   Q.   (By Mr. Samore)  Do you remember the agent being --

22   Agent Kepf being present, or are you going just on her

23   testimony?

24   A.   I'm just -- I know the man was there because I talked to

25   him.

1   Q.   The only area I'm going to ask you a question is regarding

2   your recollection of what occurred prior to your signing that

3   consent to search.  Did you sometime that morning sign a

4   consent to search?

5   A.   Yes, sir.

6   Q.   What property was being searched?

7   A.   My apartment.

8   Q.   And where was your apartment?

9   A.   1517-1/2 Gold Avenue.

10  Q.   Did you have any conversation prior to signing that consent

11  with Officer Martin regarding the situation with your dogs?

12  A.   Yes, sir, I was concerned about his health.

13  Q.   Tell the court what you told Officer Kepf about your dogs

14  and how you recall the conversation occurring.

15          MR. CAIRNS:  Your Honor, I'm going to object that

16  that's mischaracterizing his earlier testimony.  He doesn't

17  remember whether Agent Kepf was present.

18          MR. SAMORE:  If I said "Agent Kepf," I misspoke.  I

19  meant Officer Martin.

20          THE COURT:  Thank you for clarifying the record.

21  Q.   (By Mr. Samore)  Just on that area, just tell the court

22  what you recall about the conversation solely about your dog,

23  the apartment, and the signing of the consent.

24  A.   I was concerned about my dog's welfare.  He's the only

25  thing I have.  I don't have a wife or anything.  So I've grown

1   real attached to him, and I was just afraid that if I had

2   gotten arrested and hauled off, he would be in there by himself

3   and nobody to feed him, and I was basically willing to do

4   anything to get to see him.  So the officer said that if I

5   signed the paper, he'll let me go into my apartment, that I

6   would be able to take care of my dog and see him.  And

7   actually, I agreed to it.

8           MR. SAMORE:  No further questions, pass for cross.

9           THE COURT:  Mr. Robert, do you have any questions you

10  want to ask?

11          MR. ROBERT:  I do not, Your Honor, thank you.

12                      **CROSS EXAMINATION**

13  **BY MR. CAIRNS:**

14  Q.  Mr. Connors, did the agents tell you at the time that you

15  gave consent that they were writing a search warrant for your

16  apartment?

17  A.  No, sir.

18  Q.  And so then you said you expressed concern for your dog and

19  you wanted to care for the animal.  Didn't the agents try to

20  help you provide for the dog while they were searching the

21  apartment?

22  A.  Whenever I got there, they let me hold him and to make sure

23  he didn't bite at any of them, and then they had me put him in

24  the bathroom.  But they did let me make a phone call, and to

25  let somebody come -- I didn't know what I could tell the person

1    that I called, so I just told them I was going to the hospital,

2    that I was leaving my dog alone.  I didn't really know what I

3    was supposed to say to him except to come get my dog.

4           MR. CAIRNS:  That's all, Your Honor.

5           THE COURT:  All right.  Redirect?

6           MR. SAMORE:  No redirect, Judge.

7           THE COURT:  All right, Mr. Connors, thank you very

8    much, sir, you can step down and join your attorney.

9           All right.  Mr. Robert, I think the only issue

10   remaining is what other information you are asking this court

11   to disclose regarding the confidential informant.

12          MR. ROBERT:  Well, Your Honor, it boils down to our

13   ability to effectively inquire as to things that are critical

14   to a determination of the validity in this case of an arrest

15   warrant that led to this whole thing.

16          THE COURT:  Okay.

17          MR. ROBERT:  Our position is, and I made a written

18   request to the government for a lot of information, including

19   specific information about the confidential informant, and of

20   course, filed a motion when that information wasn't

21   forthcoming, and that motion is what's pending.  And, of

22   course, Mr. Cairns, after consulting with the other folks

23   involved in the case, decided to release the name of the

24   person, and so we have that, and we can conduct some additional

25   investigation, which is really kind of what we want to do.

1            But there are parts of the investigation that we can't

2    get, and one of them came to the fore today in conversations.

3    We now know that there was a contract and a list of things to

4    do and not to do that this guy was advised of and signed.

5    During his apparently short life as a credible, reliable

6    confidential informant for Region II.  Clearly, he wasn't

7    credible and reliable, and I think to the extent that that has

8    any impact on our ability to talk to the court about whether or

9    not the information that was obtained from this person,

10   including the controlled buy, was reliable and trustworthy and

11   a valid foundation for the warrant that led to all this, I

12   think we're entitled to know these things about this person.

13           In particular, what we learned today, and we didn't

14   know it before today, was that there wasn't anything before

15   this event that gave rise to any conclusion by law enforcement

16   that this was a credible, reliable person.  All they knew about

17   him, according to the agent who testified about him, was, well,

18   he was on the street, he was a drug user and maybe a drug

19   dealer.  That's all we knew.  That's not a glowing

20   recommendation.

21           Now we know, of course, that he's been terminated for

22   not completing his contract, was the phrase, I believe that was

23   used, and I think what that means is he messed up.  You know,

24   he committed an additional sin in addition to all the other

25   sins we had from this guy.  And I think, again, to the extent

1   that we are entitled and required to advise the court about

2   whether or not this guy was reliable and the proper foundation

3   for a warrant, we need to know these things.

4            So I would respectfully ask -- the guy is not a CI

5   anymore, so -- and I am certainly not planning on going out and

6   publishing his name and picture, but we need to do our

7   investigation, and that's really what that motion and our

8   continued pursuit of the motion is about.

9            THE COURT:  Okay.  But I need to know specifically what

10  you're requesting now.  Sounds like you're requesting the

11  contract and the reason he's terminated from the program.  Is

12  that right?

13           MR. ROBERT:  Yes.

14           THE COURT:  And what else?

15           MR. ROBERT:  Well, I think a lot of the other

16  information was about things that may have -- for example,

17  payment records.  There aren't any payment records; he wasn't

18  paid.  The only consideration he got was apparently some

19  consideration that's no longer on the table for a case that was

20  currently pending at the time.

21           I can't think of anything else at this time, because

22  there doesn't seem to be anything else.  I mean, I guess, to

23  the extent that some of the reasons that he was terminated had

24  to do with other investigations, I want to know about that; but

25  I'm obviously willing to accept that information in redacted

1   form so that no other either previously concluded or ongoing

2   investigations are compromised.

3          THE COURT:  Let me hear from you, Mr. Cairns.

4          MR. CAIRNS:  Your Honor, again, if you read through my

5   response to Mr. Robert's motion, and if you read from the Cruz

6   decision from the Tenth Circuit which is cited in there, I

7   really have no obligation to disclose the confidential

8   informant's identity because the narcotics that were involved

9   in the controlled buy did not result in the charge against this

10  defendant.  But we released his identity as a courtesy to the

11  defendants.

12         Also because, frankly -- and I will confess that his

13  criminal record is terrible.  I think in some ways, he was too

14  dirty to even be a CI, and so we did release his identity.  But

15  the other material Mr. Robert wants, I mean, we'll stipulate

16  that he's completely unreliable.  The agents didn't believe

17  anything that he said absent some corroboration of that.

18         I'll stipulate that he has a criminal record a mile

19  long, and that he's not an individual that is deserving of any

20  kind of trust.  But again, at each --

21         THE COURT:  That's quite a stipulation, Counsel.

22         MR. CAIRNS:  At each juncture, the information that he

23  provided to the officers was corroborated.

24         Moreover, that arrest warrant was based on the observed

25  controlled buy that took place with Mr. Connors.  It was

1    tape-recorded.  The transaction was tape-recorded.  There was

2    surveillance, constant surveillance.  The CI was thoroughly

3    searched prior to that.  After the transaction with

4    Mr. Connors, he had the narcotics on him.  That alone would

5    have given -- would have been more than sufficient to have an

6    arrest warrant issued.

7            So again, most of the stuff -- other than the contract,

8    his contract, and again, I allowed -- I did not make a lot of

9    objections when Mr. Robert was asking -- when either Mr. Samore

10   or Mr. Robert were asking about the agreement with the

11   confidential informant.  I let them go into that, into what

12   that agreement actually says.  You know, as to why he was

13   terminated from the program, I just don't think that that's

14   relevant in the context of Mr. Robert's case.  I don't think it

15   is going to help him prepare his defense in this case.

16           So I would submit that, given that we've turned over

17   pretty much everything either through discovery or actually

18   here today on the witness stand, that motion be denied.

19           THE COURT:  Thank you.

20           MR. SAMORE:  Judge, all we would say from our

21   standpoint --

22           THE COURT:  You've withdrawn your motion, Counsel.

23           MR. SAMORE:  Don't I get to be heard on the

24   stipulation?  I was going to say I accept the stipulation.

25           THE COURT:  Mr. Robert?  Do you accept the stipulation

1  that this informant is unreliable, he has a criminal record a

2  mile long, and he's not deserving of trust?

3          MR. ROBERT:  I believe completely unreliable was the

4  phrase that was used, and I accept that stipulation.

5          THE COURT:  Sorry.  Completely unreliable, criminal

6  record a mile long, not deserving of trust.  So you accept that

7  in lieu of the contract and the reason he was terminated from

8  the program?

9          MR. ROBERT:  Yes.

10         THE COURT:  All right.  Does defense have any other

11 witnesses?

12         MR. ROBERT:  Not for Mr. Jones.

13         THE COURT:  Any other evidence that needs to be

14 presented, any arguments, Counsel?

15         Again, what I propose to do is ask Mr. De La Rosa when

16 the transcript might be ready, ask you to submit proposed

17 findings and conclusions in this case, and we'll make rulings.

18         MR. ROBERT:  Your Honor, I would propose doing that in

19 lieu of an argument at this point.

20         MR. CAIRNS:  Yes, Your Honor.

21         THE COURT:  Mr. Samore?

22         MR. SAMORE:  Agreed, Judge.

23         THE COURT:  Then let's look at time.  Let me ask

24 Mr. De La Rosa, what's a reasonable time that this transcript

25 could be ready?

1          Assuming the transcript is ready on the 23rd, knowing

2   your respective schedules -- I know, Mr. Cairns, you have a

3   trial.

4          I think Mr. Samore is unavailable for a period of time.

5   Is that right?  From when, the 9th through when that you are

6   going to be unavailable?

7          MR. SAMORE:  You're on top of the file, Judge.  That's

8   correct.

9          THE COURT:  Before the transcript is available anyway.

10          MR. CAIRNS:  My trial that was scheduled to begin on

11   September 3rd has been moved to the 23rd; however, I can still

12   finish my findings and conclusions within two weeks of that

13   date.

14          THE COURT:  Okay.  So that would be October 7th.  Is

15   that correct?

16          MR. CAIRNS:  Yes, Your Honor.

17          THE COURT:  Counsel, is that a reasonable time for your

18   findings and conclusions after you receive the transcript?

19          MR. ROBERT:  On behalf of Mr. Jones, yes, Your Honor.

20          THE COURT:  October 7th, counsel.  The transcript will

21   be ready on the 23rd.  Findings and conclusions on October 7th.

22          MR. SAMORE:  Judge, that is workable.  Because I have a

23   major trial the first week and second week in October, and I'm

24   just coming back, I'm concerned about maybe needing another

25   week, but Judge Armijo has me meeting deadlines the following

1    week, so I'll get something out pretty quickly on this.

2            THE COURT:  If you can't for some reason meet the 7th

3    deadline, speak to Mr. Cairns.

4            MR. SAMORE:  We have a great relationship.

5            THE COURT:  I know you do, and I really appreciate

6    that.  It's nice to have a hearing like this.

7            MR. CAIRNS:  We've had a lot of cases together.

8            THE COURT:  I know you have.

9            MR. SAMORE:  If Mr. De La Rosa needs more time, it

10   won't break our heart.

11           THE COURT:  Okay.  So we'll say the 7th, unless you ask

12   for a continuance.  I've spent most of my career doing this

13   kind of work, and I so appreciate the professional relationship

14   between the parties, and the respect, because I don't see it in

15   some of the other cases that we have.  I'm just so used to it.

16   But I appreciate it.

17           Thank you all.  Anything else?

18           MR. CAIRNS:  No, Your Honor.  Not on behalf of the

19   government.

20           THE COURT:  All right.  Court is in recess, then.

21       (Court recessed at 1:20 p.m.)

22

23

24

25

1                    C-E-R-T-I-F-I-C-A-T-E

2    UNITED STATES OF AMERICA

3    DISTRICT OF NEW MEXICO

4

5        I, John De La Rosa, RPR, CCR, Official Court Reporter for

6    the State of New Mexico, do hereby certify that the foregoing

7    pages constitute a true transcript of proceedings had before

8    the said Court held in the City of Albuquerque, New Mexico, in

9    the matter therein stated.

10       In testimony whereof, I have hereunto set my hand on this

11   10th day of September, 2013.

12

13

14

15

16             _____
               JOHN DE LA ROSA, CCR
17             United States Official Court Reporter
               421 Gold Avenue, Southwest
18             Albuquerque, New Mexico  87102
               Phone:  505.348.2249
19

20

21

22

23

24

25

1                     I N D E X                              PAGE

2    **DEVIN VERHULST**
     Direct Examination by Mr. Cairns                           4
3    Cross Examination by Mr. Samore                           22
     Cross Examination by Mr. Robert                           43
4    Redirect Examination by Mr. Cairns                        58
     **CHRIS MARTIN**
5    Direct Examination by Mr. Cairns                          60
     Cross Examination by Mr. Robert                           73
6    Cross Examination by Mr. Samore                           74
     Redirect Examination by Mr. Cairns                        84
7    **ABBEY KEPF**
     Direct Examination by Mr. Cairns                          86
8    Cross Examination by Mr. Samore                           95
     Cross Examination by Mr. Robert                          115
9    Cross Examination (Cont'd) by Mr. Samore                 118
     Redirect Examination by Mr. Cairns                       118
10   **CHRISTINE BRITAL**
     Direct Examination by Mr. Cairns                         119
11   Cross Examination by Mr. Samore                          120
     **JOHN DENNIS**
12   Direct Examination by Mr. Cairns                         126
     Cross Examination by Mr. Robert                          128
13   **TERRENCE CONNORS**
     Direct Examination by Mr. Samore                         132
14   Cross Examination by Mr. Cairns                          134
     REPORTER'S CERTIFICATE
15   **GOVERNMENT'S EXHIBITS**                            ADMITTED
     1    Photo of glass pipe                                  67
16   2    Photocopy of Connors' Miranda warning                94
     3    Consent to Search Form                               70
17   4    Photocopy of Jones' Miranda warning                 127
     5    CD of audio recordings                               11
18   6    Photo of Connors with his dog Gateway                73

19

20

21

22

23

24

25